G.Q., Appellant–Respondent,

v.

Caleb **BRANAM** and Bloomington Hospital and Healthcare System, Appellees–Petitioners.

No. 53A01–0905–CV–237.

Court of Appeals of Indiana.

Nov. 30, 2009.

Marc O. Abplanalp, Bloomington, IN, Attorney for Appellant.

James L. Whitlatch, Holly M. Harvey, Bunger & Robertson, Bloomington, IN, Attorneys for Appellees.

## OPINION

MAY, Judge.

G.Q. appeals the trial court's order committing him to Bloomington Care Crisis Center and authorizing the facility to administer medications without his consent. We affirm.

## FACTS AND PROCEDURAL HISTORY

On February 6, 2009, thirty-nine-year-old G.Q. was taken to Bloomington Hospital for psychiatric treatment. The Appellees, Caleb Branam and Bloomington Hospital and Healthcare System, subsequently filed a petition for involuntary commitment and forced medication of G.Q. The court held a hearing on February 17, 2009, and heard testimony from G.Q. and Dr. Carey Mayer, a staff psychiatrist for the Hospital.

Dr. Mayer testified G.Q. had been brought to the hospital following a dispute with his mother. Dr. Mayer understood that G.Q. was supposed to be taking an antipsychotic medication, but refused to because he believed his mother was poisoning it. He became aggressive and held his mother hostage for over two hours. His mother was frightened by his behavior and called the police to intervene.

G.Q. disagreed that he held his mother hostage and offered his own account of the incident. He testified the medicine he was supposed to be taking was a topical hydrocortisone cream to treat shingles or some sort of rash. He believed his mother "may have been doing something with the medication," so he wanted to talk to her about it. (*Id.* at 20.) However, his mother became upset and called the police.

Dr. Mayer testified G.Q. "demonstrated symptoms of a marked paranoia," which could indicate G.Q. has schizophrenia; however, he did not know enough about the duration of G.Q.'s symptoms to make that diagnosis. (Tr. at 5.) Therefore, Dr. Mayer gave a diagnosis of psychotic disorder not otherwise specified.

In the past, G.Q.'s family has not been able to get him to comply with treatment. The family previously had attempted to have G.Q. involuntarily committed, but he would move from place to place to avoid commitment. Dr. Mayer was aware G.Q. had one previous involuntary commitment.

Dr. Mayer testified G.Q. demonstrated "various paranoid delusions." (*Id.*) G.Q. told Dr. Mayer he believed "there was a conspiracy of sorts surrounding him." (*Id.* at 13.) G.Q. thought people "would sit next to him and they would get into some kind of physical altercation either with him or . . . with other people." (*Id.*) As a result, G.Q. called the F.B.I. so many times that F.B.I. employees told him to stop calling and harassing them. Dr. Mayer considered this "evidence of psychotic thinking." (*Id.* at 14.)

G.Q. also has delusions about "informatics," which Dr. Mayer described as follows:

> . . . [O]ne of the characteristics that can happen uh, particular to paranoid schizophrenics um, and he's evidence of that is that he feels that special messages are and communications are given through um, a various media, television, radio, billboards so that they um, disclose delusions of reference. They feel that things are referring specifically and giving messages to the individual not just the actual content that we would see. There was a special message.

(*Id.* at 14–15) (errors in original). G.Q. told Dr. Mayer he has a degree "in communication and so he feels that because of that he has special uh, abilities to hear the real messages being given over media." (*Id.* at 15.)

Dr. Mayer relied in part on information given to him by others in drawing his conclusions about G.Q., but he also observed G.Q.'s agitated and paranoid behavior. There were times when Dr. Mayer felt physically threatened when he was working with G.Q. Dr. Mayer testified G.Q. is unable to "demarcate . . . reality from his delusions and he's acting on them in an aggressive manner." (*Id.* at 7.)

Dr. Mayer felt involuntary commitment was appropriate because G.Q. believes he does not have psychiatric problems and does not need medication; therefore, it was unlikely at the time G.Q. would follow through outpatient care. G.Q. testified he believes he is mentally healthy and his thought processes are "a little bit more involved." (*Id.* at 21.) G.Q. was having trouble maintaining employment, and he acknowledged feeling some stress because he was unable to find work in his field. G.Q. has a masters degree in information and communication sciences, and Dr. Mayer thought he "could otherwise be a very productive member of society" if he received appropriate treatment. (*Id.* at 8.)

At the time of the hearing, G.Q. was taking Zyprexa and had shown improvement. Dr. Mayer believed G.Q. needed to be on antipsychotic medication to sustain that improvement. Dr. Mayer did not think G.Q. was ready to be discharged, but believed he could begin outpatient treatment within a week. Dr. Mayer felt a ninety-day commitment would be sufficient, and he was hopeful that within that time, G.Q. would "notice the improvements and have the increased insight and want to stay on [medication] because he sees the value to him." (*Id.* at 10.) Dr. Mayer's goal was to prevent further inpatient hospitalizations.

Dr. Mayer testified Zyprexa and Haldol Decanoate were both appropriate antipsychotics for G.Q. He discussed the risks of the medications, but opined that the "benefits outweigh any risks by far for any of the antipsychotic medications." (*Id.* at 17.) Dr. Mayer wanted to use Haldol Decanoate because it can be injected and therefore is more practical when medication has to be forcibly administered. Haldol Decanoate also has "the huge advantage of being able to be [administered] once a month to insure the patient does get what . . . his system needs to get back to normal." (*Id.*)

The trial court ordered that G.Q. be committed to the Bloomington Care Crisis Center for a period not to exceed ninety days. The court also gave Bloomington Care Crisis Center authority to administer Haldol Decanoate and Zyprexa with or without G.Q.'s consent.

## DISCUSSION AND DECISION

G.Q. acknowledges this appeal is moot because he has been discharged from his involuntary commitment. Generally, we dismiss cases that are moot, but a moot case may be decided on its merits when it involves questions of great public interest that are likely to recur. *Golub v. Giles*, 814 N.E.2d 1034, 1036 n. 1 (Ind.Ct.App. 2004), *trans. denied.* G.Q. asks us to decide his case based on this exception to the mootness doctrine, and the Appellees do not oppose this argument. *See id.* ("The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society.") Therefore, we will address the merits of his case. *See id.* (determining the proof necessary for involuntary commitment is an issue of great importance that is likely to recur).

In a commitment proceeding, the petitioner must prove by clear and convincing evidence: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that

individual is appropriate." Ind.Code § 12–26–2–5(e). G.Q. argues there is insufficient evidence to support the finding that he is mentally ill, that he is dangerous or gravely disabled, that commitment is appropriate, and that forced medication is warranted.

When reviewing the sufficiency of evidence, we look to the evidence favorable to the trial court's decision and the reasonable inferences to be drawn therefrom. *Golub*, 814 N.E.2d at 1038. We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If the order "represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible." *Id.*

### 1. *Mental Illness*

■ "Mental illness" is defined as "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Ind.Code § 12–7–2–130(1). Dr. Mayer diagnosed G.Q. with psychotic disorder not otherwise specified. The diagnosis was based in part on the delusional thoughts G.Q. shared with Dr. Mayer. Specifically, G.Q. believed he received special messages through the media beyond the actual content of the communications. In addition, he believed his mother had been adding poison to his medications, and he believed there was a conspiracy in which people would seek to get into physical altercations with him. G.Q. acted on these delusions by becoming aggressive with his mother and by calling the F.B.I. so many times that the F.B.I. felt harassed by his calls. Although G.Q. offered some alternate explanations for his behavior, Dr. Mayer's testimony provided a reasonable basis on which the court could conclude that G.Q. has a mental illness as defined

by Ind.Code § 12–7–2–130(1), and we will not reweigh the evidence.

### 2. *Dangerous or Gravely Disabled*

■ The Appellees bore the burden of proving G.Q. was dangerous or gravely disabled; they did not have to prove both. *C.J. v. Health & Hosp. Corp. of Marion County*, 842 N.E.2d 407, 410 (Ind.Ct.App. 2006). As the evidence supports finding G.Q. was dangerous, we will not address the evidence that he was gravely disabled.

■ Ind.Code § 12–7–2–53 defines "dangerous" as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm others." "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *Commitment of C.A. v. Center for Mental Health*, 776 N.E.2d 1216, 1218 (Ind.Ct.App.2002).

Dr. Mayer testified G.Q. held his mother hostage because he believed she was adding poison to his medication. G.Q.'s behavior scared his mother, and the police had to intervene. Although G.Q. disputed some of the details, he acknowledged he was concerned his mother was "doing something" to his medication and the police were called when he confronted her about it. (Tr. at 20.)

G.Q. attempts to challenge Dr. Mayer's testimony to the extent it was based on information from other people, but G.Q. did not object to this testimony at trial and pursued only minimal cross-examination on the source of Dr. Mayer's information. *See Dennerline v. Atterholt*, 886 N.E.2d 582, 590 (Ind.Ct.App.2008) (failure to object to evidence at trial waives the issue for appeal), *reh'g denied, trans. dismissed.* Moreover, Dr. Mayer's testimony was based in part on his own observations, and

he stated there were times he felt threatened by G.Q. Because G.Q. does not recognize his illness and refuses to take medication, he is unable to "demarcate ... reality from his delusions," and G.Q. acts on those delusions in an aggressive manner. (Tr. at 7.) Therefore, the record supports a conclusion that G.Q. was dangerous and the dangerousness was a result of his mental illness.

### 3. *Appropriateness of Commitment*

For many of the reasons already discussed, the record supports a conclusion that commitment was appropriate for G.Q. G.Q. does not acknowledge his psychiatric problems and will not voluntarily take medication. He suffers from delusions that sometimes result in aggressive behavior. He has trouble maintaining employment despite his advanced education. G.Q. previously has been committed involuntarily, and Dr. Mayer hoped proper treatment would prevent the need for future inpatient treatment. Dr. Mayer unequivocally testified that medication would benefit G.Q. and that he had already shown signs of improvement while taking Zyprexa. Dr. Mayer was hopeful that during commitment, G.Q. would come to see the benefit of taking medication. Therefore, the trial court's order represents a conclusion a reasonable person could have drawn. *See In re Commitment of Heald*, 785 N.E.2d 605, 615 (Ind.Ct.App. 2003) (commitment was appropriate because Heald did not acknowledge her mental illness and refused to take medication, and there was no evidence that family was able to appropriately monitor her condition), *trans. denied.*

### 4. *Forced Medication*

Finally, G.Q. argues the trial court's order authorizing forced medication does not comply with *In re Mental Com-*

*mitment of M.P.*, 510 N.E.2d 645 (Ind. 1987). In *M.P.*, our Supreme Court held a petitioner

must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient.

*Id.* at 647. In addition, the order must limit the time period within which the medications may be administered. *Id.* at 648.

Dr. Mayer made an individual assessment of G.Q.'s condition and determined antipsychotic medications would benefit G.Q. Dr. Mayer explained the risks of antipsychotic drugs, but stated those risks are "very small" for Zyprexa and only slightly increased with Haldol Decanoate. (Tr. at 17.) Dr. Mayer opined that the benefit of the drugs would "outweigh any risks by far." (*Id.*) He felt Haldol Decanoate was particularly advantageous because it could be injected just once a month.

G.Q. argues Dr. Mayer's testimony was conclusory and does not clearly indicate that the medications are designed to treat the condition rather than simply control his behavior. However, Dr. Mayer testified antipsychotic drugs would provide "what ... his system needs to get back to normal." (*Id.*) The trial court could infer from this testimony that the drugs would treat G.Q.'s condition, and not simply control his behavior.

G.Q. also argues the order is deficient because it does not limit how long he can be forced to take medication, as required

by *M.P.* *M.P.* involved a patient who was subject to a regular commitment, which is indefinite in length. *See* Ind.Code § 12–26–7–5 (regular commitment continues until individual is discharged from the facility or program or the court enters an order terminating the commitment). In contrast, G.Q. was subject to a temporary commitment, which may last no more than ninety days. *See* Ind.Code § 12–26–6–1. The trial court did not explicitly limit the forced medication order. However, the court committed G.Q. to the Bloomington Care Crisis Center for a period not to exceed ninety days, and authorized only the Bloomington Care Crisis Center to administer medication without G.Q.'s consent. Therefore, we conclude the forced medication order was limited as required by *M.P.*

The judgment of the trial court is affirmed.

Affirmed.

CRONE, J., and BROWN, J., concur.