In the Matter of the COMMITMENT OF S.T., Appellant–Respondent,

v.

COMMUNITY HOSPITAL NORTH, In–Patient Psychiatric Unit, Appellee–Petitioner.

No. 49A04–0910–CV–617.

Court of Appeals of Indiana.

July 29, 2010.

Suzy St. John, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

David J. Mallon, Jr., Jenny R. Wright, Ice Miller LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

S.T. appeals her temporary involuntary commitment. Finding the evidence sufficient to support the trial court's finding that she was dangerous to herself, we affirm.

## FACTS AND PROCEDURAL HISTORY[1]

On September 20, 2009, S.T., a twenty-three year old female, attempted suicide by swallowing a large amount of Tylenol. After waking up in the Intensive Care Unit at Community Hospital North ("Hospital"), S.T. voluntarily admitted herself to the Psychiatric Care Unit. On September 24, S.T. signed a 24–hour Notice to Leave, but she was not released the next day. Instead, Dr. Dianne Martin, the psychiatrist who had been treating S.T., filed a petition for emergency detention based on

---

1. We heard oral argument June 23, 2010. We thank counsel and commend them on the quality of their advocacy.

her interaction with S.T. and S.T.'s behavior and interactions with other staff members.

S.T., an Operation Iraqi Freedom veteran confined to a wheelchair, has been diagnosed with post traumatic stress disorder ("PTSD") and a non-specific mood disorder. S.T. told Dr. Martin she also had been diagnosed with Attention Deficit Disorder. She engages in behavior consistent with pica, an eating disorder characterized by the ingestion of non-food items.

On September 28, staff took S.T. from the Psychiatric Care Unit to remove earrings from S.T.'s digestive tract. During the procedure she ripped out her IVs and was so inconsolable the procedure had to be stopped. Staff had to wheel her back to the In–Patient Psychiatric Unit on a cot, rather than in her wheelchair. While in the Psychiatric Care Unit, S.T. was verbally abusive and threatening to staff members on at least two occasions. Her behavior put staff members "on guard." (Tr. at 24.)

On September 29, the trial court heard testimony regarding S.T.'s mental illnesses and the behaviors that prompted the involuntary commitment request. Based on this evidence, the trial court found S.T. was "still a danger to herself and that there remains a substantial risk that she would harm herself." (*Id.* at 48.) The judge ordered involuntary commitment at the Psychiatric Care Unit for no more than ninety days.

## DISCUSSION AND DECISION

■ S.T.'s period of involuntary commitment has already passed. Generally, we dismiss cases that are moot, but a moot case may be decided on its merits when it involves questions of great public interest, such as involuntary commitment, that are likely to recur. *Golub v. Giles*, 814 N.E.2d 1034, 1036 n. 1 (Ind.Ct.App.2004), *trans. denied.*

■ Proceedings for involuntary commitment are subject to federal due process requirements. For the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty" and thus "requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see also C.J. v. Health and Hosp. Corp. of Marion County*, 842 N.E.2d 407 (Ind.Ct.App.2006). The loss of liberty produced by an involuntary commitment is more than a loss of freedom resulting from the confinement. Commitment to a mental hospital "can engender adverse social consequences to the individual; . . . [w]hether we label this phenomena stigma or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington*, 441 U.S. at 425, 99 S.Ct. 1804.

■ The *Addington* court expressed concern that an involuntary commitment might be ordered on the basis of a few isolated instances of unusual conduct occurring within a range of conduct that is generally acceptable. As everyone exhibits some abnormal conduct at one time or another, "loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id.* at 427, 99 S.Ct. 1804. To satisfy the requirements of due process, the State must prove by clear and convincing evidence the facts justifying an involuntary commitment. *Commitment of M.M.*, 826 N.E.2d 90, 96 (Ind.Ct.App. 2005), *trans. denied.*

*Standard of Review*

■ S.T. first urges us to reconsider the standard by which we review involuntary commitments. When reviewing whether the evidence supports an involun-

tary commitment, we look only at the evidence and reasonable inferences therefrom most favorable to the trial court's judgment. *Id.* We may not reweigh the evidence or judge the credibility of the witnesses. *Id.* "If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible." *Id.*

S.T. argues a *de novo* review would be more appropriate, and cites *Kladis v. Nick's Patio, Inc.* 735 N.E.2d 1216, 1219 (Ind.Ct.App.2000). *Kladis* involved a request for a preliminary injunction based on a non-compete clause in a contract. When stating the standard of review for the grant or denial of a preliminary injunction, that panel noted, "we review questions of law and the overall sufficiency of the evidence as a matter of law with no deference given to the trial court's determination." *Id.* S.T. asserts that statement means we should review *de novo* this trial court's determination that S.T. was a danger to herself. We disagree.

■ Just before the language S.T. quoted from *Kladis,* was this language:

> This court has no authority to weigh the evidence and resolve factual controversy in determining the appropriateness of injunctive relief. Rather we look to the trial court's findings of fact as required by T.R. 52 and 65.

*Id.* (citations omitted). In that context, the language on which S.T. relies cannot be read to mean that we may usurp the trial court's authority to weigh evidence and resolve factual disputes:

> There can be no doubt as to the division of responsibility and authority between trial and appellate courts. The trial courts of this state exclusively hear and weigh the evidence and inferences arising therefrom, and assess the credibility

of witnesses, to determine the facts prior to entering judgment or taking other action. Courts of appeal have no such authority.

*Whiteco Industries, Inc. v. Nickolick,* 549 N.E.2d 396, 398 (Ind.Ct.App.1990).

In addition, the decision on which the *Kladis* panel relied does not suggest we may review sufficiency of the evidence with no deference to the trial court, *see Fumo v. Medical Group of Michigan City, Inc.,* 590 N.E.2d 1103, 1107 (Ind.Ct.App. 1992), *reh'g denied, trans. denied,* nor do any decisions since *Kladis. See, e.g., Jackson v. State,* 925 N.E.2d 369 (Ind.2010) (stating the standard of review for sufficiency of evidence claims is well settled, and we will not reweigh evidence or judge the credibility of witnesses).

S.T. also cites *B.K.C. v. State,* 781 N.E.2d 1157, 1163 (Ind.Ct.App.2003), a juvenile delinquency case, for the proposition that the reasonable inferences from the evidence presented in the trial court must be drawn from "substantial evidence of probative value to support the judgment." That statement merely reflects the standard for reviewing whether evidence is sufficient to support a trial court's decision. *See Scott v. State,* 895 N.E.2d 369, 374 n. 3 (Ind.Ct.App.2008) (reviewing record for substantial evidence of probative value to support trial court's sexually violent predator finding, as that standard applies to both civil and criminal cases). It does not suggest error in the case before us because, as explained below, the record contains substantial evidence of probative value to support S.T.'s temporary involuntarily commitment.

She also cites *Linger v. State,* 508 N.E.2d 56, 59 (Ind.Ct.App.1987), to support her assertion that the determination of "substantial evidence" is a question of law. In that case, we said:

As an appellate tribunal, we neither reweigh the evidence nor judge the credibility of witnesses when an appellant challenges the sufficiency of the evidence, but consider only the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. We review the evidence for the purpose of determining, as a matter of law, whether there is substantial evidence of probative value from which a jury could reasonably infer or find the existence of each material element of the crime in order to reach the conclusion that the accused has been proved guilty beyond a reasonable doubt. Substantial evidence of probative value is evidence that has the qualities of directness and freedom from uncertainty.

*Id.* (internal citations omitted). While we do review as a "matter of law" the question whether evidence is "substantial," we do so by determining whether evidence was presented to satisfy each statutory element of the offense at issue. *See, e.g., Gray v. State,* 903 N.E.2d 940 (Ind.2009) (evidence insufficient as a matter of law because use of deadly weapon was an element of the crimes and the State did not demonstrate use of a deadly weapon).

 We explained in *Lowman v. Lowman,* 109 Ind.App. 163, 164, 33 N.E.2d 780, 785 (Ind.Ct.App.1941), why we do not review evidence *de novo:*

Only the trial court sees the witnesses on the stand, their demeanor in testifying, their candor, or lack of candor, in disclosing facts about which they have knowledge. Juries and trial courts, quite often, properly, give more weight to the demeanor of witnesses than to the substance of their statements in the determination of truth. An Appellate Court, considering only the statements, is denied the assistance of this necessary factor.

*See also Drane v. State,* 867 N.E.2d 144, 147 (Ind.2007) ("Accounting for the trial court's role as finder of fact to decide what evidence to credit, the task for us, as an appellate tribunal, is to decide whether the facts favorable to the verdict represent substantial evidence probative of the elements of the offenses.").

 The determination of dangerousness under the involuntary commitment statute has always been a question of fact for the trial court to decide. *See, e.g., G.Q. v. Branam,* 917 N.E.2d 703, 707 (Ind.Ct. App.2009); *In re Commitment of A.W.D.,* 861 N.E.2d 1260, 1264–65 (Ind.Ct.App. 2007), *trans. denied; M.Z. v. Clarian Health Partners,* 829 N.E.2d 634, 637–38 (Ind.Ct.App.2005), *trans. denied; Commitment of J.B. v. Midtown Mental Health Center,* 581 N.E.2d 448, 451 (Ind.Ct.App. 1991). S.T. has not directed us to uncontroverted facts in the record that would change that determination into a question of law that we could review *de novo.*

Finally, at oral argument, S.T.'s counsel asserted we should adopt a new standard because the well-established standard was not being applied consistently. This standard of review was first stated in *Jones v. State,* 477 N.E.2d 353, 360 (Ind.Ct.App. 1985) (Sullivan, J. concurring in result), *reh'g denied, trans. denied,* and has been applied in every subsequent involuntary commitment case we have reviewed. Our review of sixty-seven decisions over the last twenty-five years, including published and unpublished opinions, leads us to disagree with S.T.; but to address S.T.'s concern, we take this opportunity to explain the standard in more detail.

 Ind.Code § 12–7–2–130 defines mental illness as:

(1) For purposes of IC 12–23–5, IC 12–24,[2] and IC 12–26, a psychiatric disorder that:

---

**2.** Ind.Code article 12–24 deals with the "Voluntary and Involuntary Treatment of Mentally

(A) substantially disturbs an individual's thinking, feeling, or behavior; and

(B) impairs the individual's ability to function.

The term includes mental retardation, alcoholism, and addiction to narcotics or dangerous drugs.

(Footnote added.) Because symptoms of mental illness can range from the benign to the severe, the determination whether an involuntary commitment is appropriate is fact-sensitive. *See, e.g., K.M. v. State*, 804 N.E.2d 305, 309 (Ind.Ct.App.2004) (noting there was no clear judicial definition of "beyond rehabilitation," because whether a juvenile is "beyond rehabilitation is fact sensitive and can vary widely from individual to individual and circumstance to circumstance").

We have held involuntary commitment appropriate for a paranoid schizophrenic patient who was delusional and "severely mentally ill" at the time she was scheduled to be released from prison for a murder that likely was a result of her mental illness. *In re: Commitment of Heald*, 785 N.E.2d 605, 610 (Ind.Ct.App.2003), *trans. denied.* In contrast, commitment was not appropriate for a patient with a family history of schizophrenia who had begun to display strange behaviors, because those behaviors had not yet become dangerous. *In re: Commitment of Steinberg*, 821 N.E.2d 385, 389 (Ind.Ct.App.2004).

▮▮▮▮ Indiana Code § 12–26–2–5(e) requires a petitioner to demonstrate "by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." "Dangerous" means "a condition in which an individual[,] as a result of mental illness, presents a substantial risk that the individual will harm the individual

or others." Ind.Code § 12–7–2–53. "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *In re Commitment of C.A.*, 776 N.E.2d 1216, 1218 (Ind. Ct.App.2002). Thus, for example, in *Commitment of J.B.*, 581 N.E.2d at 452, J.B.'s commitment was supported by evidence she exited her mother's car at a stoplight and hitchhiked to avoid her mother. We determined "[w]hile J.B. may have made a choice that many members in our society would not think worth the risk, her conduct presents too slender a thread to support an involuntary commitment." *Id.* In other words, abnormal risk-taking will not support a finding a person is dangerous as defined by statute unless that risk-taking is caused by mental illness.

▮▮▮ A review of past decisions indicates we consider three factors to determine whether the totality of the circumstances support an involuntary commitment: the gravity of the behavior leading to hospital admission, behavior in the hospital, and the relationship between problematic behaviors and the person's mental illness. *See, e.g., GPH v. Giles*, 578 N.E.2d 729, 731 (Ind.Ct.App.1991) (involuntary commitment affirmed where GPH was admitted to hospital after stopping his medication, cutting his hand, twice trespassing while scantily clad, exhibiting other behaviors consistent with prior schizophrenic episodes, and refusing food and medication at the hospital because he thought they were poison), *reh'g denied, trans. denied; Cheek v. State*, 567 N.E.2d 1192, 1197 (Ind.Ct. App.1991) (involuntary commitment affirmed when schizophrenic was admit-

Ill Individuals."

ted for catatonic behavior and homicidal thoughts and displayed unpredictable behavior by impulsively striking out at hospital staff); *Jones,* 477 N.E.2d at 360 (involuntary commitment affirmed when paranoid schizophrenic, who was admitted for erratic behavior that attracted police attention, was verbally abusive and physically threatening to hospital staff, resulting in seclusion from other patients).

For all these reasons, we decline S.T.'s invitation to change the standard of review in cases involving the sufficiency of the evidence required for involuntary commitment.

*S.T.'s Involuntary Commitment*

S.T. claims there is insufficient evidence she is dangerous to herself. As we may not reweigh evidence or judge credibility of witnesses, *M.M.,* 826 N.E.2d at 96, we will affirm if the commitment order "represents a conclusion that a reasonable person could have drawn ... even if other reasonable conclusions are possible." *Id.*

■ During her hospitalization, S.T. admitted to "irritability, mood swings, racing thoughts, poor anger management, erratic sleep, [and] increased risk-taking behaviors." (Tr. at 9.) According to testimony at the involuntary commitment hearing, S.T. had interacted with physicians and patients with "extreme anger," (*id.* at 11), made threats, and had to be secluded from other patients at least once after engaging in "yelling, destructive behavior ... [and an] altercation with a peer." (*Id.* at 21.) Her treating psychiatrist, Dr. Martin, opined S.T. was a danger to herself. She testified that while S.T. "says she has an anger problem ... I don't think she understands how that anger problem poses significant problems

for her, the way she interacts on a personal level." (*Id.* at 12.)

The Hospital likens the facts in *Commitment of M.M.,* 826 N.E.2d at 99, to S.T.'s situation: "the Court found that M.M.'s behavior of screaming at staff, physicians, nurses, and other patients in the unit, interfering with the treatment of patients, and refusing to take her medication supported a finding that M.M. posed a danger to herself." (Appellee's Br. at 9.) S.T. notes we have found the requirement of dangerousness to be supported by a patient's unwillingness to take medication. *See, e.g., Commitment of C.A.,* 776 N.E.2d at 1218 (involuntary commitment appropriate when patient had a history of not taking medication without which he became paranoid and unable to function); *Commitment of M.M.,* 826 N.E.2d at 98 (M.M. was properly committed based on testimony that "M.M. had no insight into her illness or the necessity of taking medication"). But she asserts that because she was compliant in taking her medications in the Hospital and was open to outpatient treatment, there was no indication she would not continue to take her medication in the future.

However, while at the Hospital and throughout the involuntary commitment hearing, S.T. expressed concern that she might not be able to get her prescriptions filled. She initially refused to take her medication for that reason. Dr. Martin gave S.T. sample packets of her medication in an effort to make sure S.T. stayed on her medication for at least a month after she left the Hospital. But S.T. had no insurance or Veteran's Administration benefits at the time of the hearing, and it was unclear if there would be a lapse in medication following her release.[3]

---

**3.** S.T. had just begun the process of applying for her Veteran's Administration benefits, but she needed information located at her former residence to complete the process.

In addition, S.T. argues the trial court inaccurately characterized pica as a disorder in which a person swallows non-food items in an effort to harm herself and should not have considered her pica-like behaviors to be a mental illness. S.T. testified that she had been "eating metal since [she] was three." (Tr. at 32.) The Hospital presented evidence S.T. did not respond well to removal of earrings she swallowed when she was unmedicated, and the Hospital argued this increased the possibility S.T. would be harmed after ingesting a non-food item.

Based on this testimony, the court found three facts indicated S.T. was a danger to herself: her behavior towards Hospital staff due to her mental illness, her continued attitude of "hopelessness" about obtaining medication through the Veteran's Administration, (*id.* at 48), and the possibility of escalated risk of danger to herself as a result of pica.

Applying the factors discussed above to S.T.'s case, we note: (1) her initial visit to the hospital was due to an overdose of Tylenol; (2) during her time at the hospital, she exhibited destructive and angry behavior, and was separated from other patients at one point because of this behavior; and (3) this behavior was caused or exacerbated by a nonspecific mood disorder and PTSD. Based on the totality of the circumstances, a reasonable person could have come to the same conclusion as the trial court.

There was sufficient evidence to involuntarily commit S.T. for a period of no more than ninety days. Therefore, we affirm.

Affirmed.

BAILEY, J., and BARNES, J., concur.