**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**PATRICIA CARESS MCMATH**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JENNY R. BUCHHEIT**
**BRANDI L. BENNETT**
Ice Miller LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE CIVIL COMMITMENT OF: | ) |
| | ) |
| J.B., | ) |
| | ) |
|     Appellant-Respondent, | ) |
| | ) |
|         vs. | )    No. 49A04-1202-MH-85 |
| | ) |
| COMMUNITY NORTH HOSPITAL | ) |
| GALLAHUE MENTAL HEALTH, | ) |
| | ) |
|     Appellee-Petitioner. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Gerald Zore, Judge
Cause No. 49D08-1201-MH-002576

**September 21, 2012**

**BARNES, Judge**

## Case Summary

J.B. appeals the trial court's order temporarily committing her at Community Hospital North in Indianapolis ("Community"). We affirm.

## Issue

The sole issue is whether there was sufficient evidence to support a temporary commitment order.

## Facts

On January 18, 2012, an Indianapolis Metropolitan Police Department officer was called to a motel where J.B. was staying. The officer learned that J.B. was "seeing faces and friends that do not exist." App. p. 10. The officer also noted that J.B. had "wanted to harm herself in the past," that she appeared "very paranoid," and that J.B. said she was "on meds but would not advise what." Id. Based on the officer's observations, J.B. was admitted to Community for emergency detention.

J.B. was examined at Community by Dr. Kanwal Sidhu. J.B. told Dr. Sidhu that she had left her home and her husband because she suspected him of putting spyware on her computer and also said "they were monitoring her." Tr. p. 7. J.B. appeared "very paranoid" and seemed to think Community and Dr. Sidhu were performing some kind of experiment on her. Id. She also related to Dr. Sidhu that in August 2011, she had gone to the top of a parking garage and considered jumping off but at the last moment decided not to. Id.

Dr. Sidhu diagnosed J.B. as suffering from bipolar disorder with psychosis and being in the midst of a manic episode. The August incident in which J.B. seriously contemplated suicide may have been a depressive episode that had followed another manic episode, and Dr. Sidhu feared it was "very likely" J.B. could attempt suicide again. Id. at 12. J.B. was having difficulty sleeping and displaying paranoia, such as believing that the hospital staff was secretly medicating her and that there were pollutants coming through the air conditioning vents. Dr. Sidhu also noted that J.B. had rambling thoughts and agitation and that her mental illness had led to deterioration in her judgment, reasoning, and behavior. Specifically, Dr. Sidhu noted that J.B. had lost her job, was losing her marriage, and was socially impaired. J.B. also did not believe she needed medication for her illness, although Dr. Sidhu stated that bipolar mania was very effectively treated with medication and, indeed, had to be treated with medication and not through other means such as talk therapy. Dr. Sidhu also observed that although J.B. had attended group therapy sessions at Community, she was unable to effectively participate in them because of her paranoia. Additionally, although J.B. initially was placed in a unit of Community for persons with mild mental illness, she had to be transferred to a psychotic intensive care unit for persons with extreme agitation and paranoia. Within the first several days of J.B.'s emergency commitment, she twice had to be injected with antipsychotic medication to sedate her. Dr. Sidhu believed J.B. needed to be committed and put on a medication treatment plan to relieve her manic episode.

On January 26, 2012, the trial court held a hearing to determine whether J.B. should be subject to a temporary commitment order. After the hearing, the trial court found that J.B.

3

was gravely disabled and ordered that she be committed to Community for no longer than ninety days, or not after April 25, 2012, unless discharged earlier. J.B. now appeals.

**Analysis**

Before turning to the merits of J.B.'s arguments, we address Community's claim that her appeal is moot because the temporary commitment order already has lapsed.[1] Generally, a case is moot when a court cannot render effective relief to an appellant. See In re Commitment of J.B., 766 N.E.2d 795, 798 (Ind. Ct. App. 2002). However, this court frequently has decided to address the merits of appeals regarding involuntary mental health commitments, even where that commitment has already ended. See, e.g., id.; see also Commitment of S.T. v. Community Hosp. North, 930 N.E.2d 684, 687 (Ind. Ct. App. 2010). We have done so under the "public interest" exception to the mootness doctrine, under which we may decide moot cases on the merits when a case involves a question of great public interest that is likely to recur. See Golub v. Giles, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004), trans. denied.

Moreover, as J.B. notes, the temporary commitment order in her case is not without possible future consequences. The first time that a person is subjected to a commitment proceeding, a trial court may only order temporary commitment of the person, which cannot exceeded ninety days. See Ind. Code §§ 12-26-5-11(c); 12-26-6-1. If, however, a person has

_____

[1] It is unclear from the record whether J.B. actually stayed at Community for the full ninety days of the temporary commitment order. Dr. Sidhu testified at the commitment hearing that "a few weeks" of commitment to ensure that J.B. was taking her medications likely would suffice to stabilize her mental health, or possibly even that she could be discharged to home within a week of the commitment hearing. Tr. pp. 12, 14.

4

previously been the subject of a commitment proceeding, a trial court may order a regular commitment, which can be of indefinite length. See I.C. §§ 12-26-5-11(d); 12-26-7-5. Thus, J.B.'s on-the-record temporary commitment order would permit a trial court in the future to order her to an indefinite, regular commitment, while without that order it could only order a temporary commitment. We further note that given the ninety-day time limit for a temporary commitment, such an order likely could never be reviewed in the normal course of appellate review. We will address the merits of J.B.'s challenge to her commitment.

When reviewing whether the evidence supports an involuntary mental health commitment, we consider only the evidence and reasonable inferences therefrom most favorable to the trial court's judgment. In re Involuntary Commitment of A.M., 959 N.E.2d 832, 834-35 (Ind. Ct. App. 2011). We cannot reweigh the evidence or judge the credibility of witnesses. Id. at 835. If the trial court's commitment reflects a conclusion that a reasonable person could have made, we will affirm the order even if other reasonable conclusions are possible. Id.

Because civil commitment constitutes a significant deprivation of liberty, a petitioner seeking commitment must show that the person to be committed is demonstrating something more than "'idiosyncratic behavior.'" Id. (quoting Addington v. Texas, 441 U.S. 418, 427, 99 S. Ct. 1804, 1810 (1979)). In Indiana, a person may be involuntarily committed only if the petitioner proves by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate. Id. (citing I.C. § 12-26-2-5(e)(1)).

5

Here, the trial court found J.B. to be "gravely disabled."[2] The statutory definition of that term is that a person is either "unable to provide for that individual's food, clothing, shelter, or other essential human needs;" or that the person "has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently." I.C. § 12-7-2-96. A petitioner seeking commitment is only required to prove one of these two possibilities for grave disability. In re Commitment of G.M., 938 N.E.2d 302, 303 n.1 (Ind. Ct. App. 2010). There is no evidence or claim here that J.B. was unable to provide for her needs; thus, we focus solely upon whether there was sufficient evidence of a substantial impairment or mental deterioration making her unable to function independently.

In J.S. v. Center for Behavioral Health, 846 N.E.2d 1106, 1113 (Ind. Ct. App. 2006), trans. denied, this court held there was sufficient evidence of grave disability where an individual did not believe that she was mentally ill, despite a history of such illness, did not want to take her medication, and experienced severe psychotic symptoms when not taking her medicine. Similarly, in In re Commitment of Bradbury, 845 N.E.2d 1063, 1065 (Ind. Ct. App. 2006), we held there was sufficient evidence that a person suffering from a manic episode of bipolar disorder was gravely disabled where he exhibited disorganized, aggressive, agitated, and delusional behavior, hardly slept, had to be secluded from others, and refused to take medication. J.B.'s situation is similar in many respects to those of the patients in J.S. and Bradbury.

---

[2] J.B. makes no argument that either: (1) she was not mentally ill; or (2) that commitment was inappropriate,

6

J.B., however, asserts that her situation is more comparable to that found in K.F. v. St. Vincent Hosp. & Health Care Center, 909 N.E.2d 1063 (Ind. Ct. App. 2009). In that case, we reversed a commitment order for a sixty-two year-old woman who was newly diagnosed as bipolar and had exhibited some changed behavior, such as spending much more money than before, going to bars several nights a week, making unusual late-night phone calls, and being involved in multiple automobile accidents. We stated that although the woman had refused to take medication for bipolar disorder, her wish for a second opinion regarding a "late-in-life" diagnosis that she had that condition was "hardly a completely irrational reaction." K.F., 909 N.E.2d at 1067. We also observed that her long-time husband fully supported her financially and emotionally and that he testified against her commitment. Id. Her increased spending was explained by a recent inheritance and, although she had increased her drinking, there was no evidence that any of her car accidents—only two of which had been deemed to be her fault—were alcohol-related. Id.

We conclude that K.F. is not controlling here and that J.B.'s arguments for reversal are an invitation to reweigh the evidence, which we must decline. Dr. Sidhu presented testimony regarding the depth and severity of J.B.'s mental illness, which on its face was much more severe than that of the woman in K.F. J.B. clearly was suffering from severe paranoid delusions. Those delusions, for which J.B. refused to take recommended medications, prevented her from participating in group therapy sessions. In the first days of her emergency commitment, she twice had to be given antipsychotic medications to calm her

---

assuming she was mentally ill and gravely disabled.

7

highly-agitated state. She was unable to remain in Community's unit for persons with mild mental illness and had to be transferred to a unit for psychotic patients. Dr. Sidhu also noted that J.B. had recently lost her job and was in the process of losing her marriage. To the extent J.B. argues there was an alternative explanation for her job loss, we reiterate that we cannot reweigh the evidence; the clearly reasonable inference to be made from the entirety of Dr. Sidhu's testimony was that J.B.'s mental illness was impairing her ability to hold a job, to be married, and to have normal social relations.[3] J.B. also was refusing to take medications for her illness, which was the only effective way to treat that illness.

We also observe that J.B.'s mother testified at the hearing in favor of temporary commitment. She stated in part that J.B. told her that "everyone in the hospital is against her" and that she—J.B.'s mother—was in danger just for talking to J.B. Tr. p. 25. This was more evidence of J.B.'s severe paranoia. J.B.'s mother further testified, "We want her to take the medicine, and then be able to come home to our house, and recover from this. And, get the treatment she needs, but she won't let them willingly give it to her, so here we are." Id. at 27. This clearly reflects the belief of J.B.'s mother that a period of commitment was, unfortunately, required in order for J.B. to recover her mental health. No other family members of J.B. testified. Thus, unlike in K.F., there was no testimony by any of J.B.'s family members who were opposed to commitment.

Also, unlike in K.F., J.B. was in uncertain living and financial arrangements when her

---

[3] Before the onset of her mental illness, J.B. obtained a doctorate in physical therapy. This indicates that J.B. is capable of functioning at a very high level, mentally, and which also provides a stark contrast to her mental state at the time of her commitment.

commitment was sought. She was living in a motel as a result of difficulties with her husband and had lost her job; again, the evidence most favorable to the trial court's judgment was that those troubles were at least partially related to her severe mental illness. Although J.B. may not have been starving or living on the streets, we do not believe the gravely disabled requirement for commitment mandates a showing of homelessness and/or complete destitution. We further note that J.B. had come extremely close to attempting suicide in the recent past, which Dr. Sidhu clearly believed was related to her mental illness and that there was a significant risk she would again seriously contemplate suicide if she did not receive proper treatment. Finally, J.B. testified during the commitment hearing that she did not believe Dr. Sidhu had examined her thoroughly enough to make a proper diagnosis of her, as an excuse for not wanting to take medication based on his diagnosis. Again, however, we cannot reweigh the evidence; Dr. Sidhu is a trained physician who strongly believed medication was the only way J.B. could get better. The trial court clearly agreed, and it is not for this court to second-guess that determination. We conclude there is sufficient evidence that J.B. suffered from such deterioration in her mental health that her ability to function independently was severely comprised, rendering her gravely disabled.

## Conclusion

There was sufficient evidence to support the trial court's finding that J.B. was gravely disabled so as to support her temporary commitment to Community. We affirm.

Affirmed.

VAIDIK, J., and MATHIAS, J., concur.

9