**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**STEVEN E. RIPSTRA**
Ripstra Law Office
Jasper, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Commitment of T.G., | ) | |
| | ) | |
| Appellant-Respondent.[1] | ) | No. 19A05-1306-MH-303 |
| | ) | |
| | ) | |

APPEAL FROM DUBOIS CIRCUIT COURT
The Honorable William E. Weikert, Judge
Cause No. 19C01-1211-MH-161

**December 17, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

---

[1] We recognize that the Office of the Attorney General filed, and we accepted, a Special Appearance and Notice of Non-Involvement, stating that it is not a proper party to this case because T.G.'s commitment and care was not ordered to be completed at a State-run facility.

Following a series of hearings, T.G. appeals a regular mental health commitment[2] order, raising the following consolidated and restated issues:

I.      Whether sufficient evidence supported the trial court's regular mental health commitment order and special conditions associated with it; and

II.     Whether it was reversible error for the trial court not to grant T.G.'s request for a public mental health commitment hearing.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In November 2011, T.G., then twenty-seven years old, was placed under temporary mental health commitment and was admitted as a patient to Southern Hills Counseling Center ("Southern Hills") in Jasper, Indiana, where he stayed until December 12, 2011. His discharge diagnosis was "schizoaffective disorder, bipolar type versus bipolar I mania with psychosis." *Appellant's App*. at 13. He was also diagnosed with "marijuana and K2 dependence and antisocial personality disorder." *Id*. Upon release, he was instructed to take certain medications, which he has admitted he did not take.

At issue in this case is T.G.'s behavior in the weeks leading up to November 28, 2012. Earlier that month, T.G. lost his job and encountered issues regarding housing. For a period of time, T.G. was living in a tent on family-owned wooded property. His relationship with his parents was strained and included conflict. T.G. was angry that his

---

[2] "'A regular commitment is the most restrictive form of involuntary treatment and is proper for an individual whose commitment is expected to exceed ninety days.'" *In re Commitment of A.W.D*., 861 N.E.2d 1260, 1264 (Ind. Ct. App. 2007) (quoting *J.S. v. Ctr. for Behavioral Health,* 846 N.E.2d 1106, 1111 (Ind. Ct. App. 2006), *trans. denied*), *trans. denied*.

parents had contacted law enforcement concerning his living situation in the tent and that the police had checked on his well-being.

On November 5, 2012, T.G. arrived at Southern Hills as a walk-in and was seen by Amber Linne ("Linne"), an on-call therapist. T.G. came back the next day as a walk-in and asked to see her again. Stacy Moore-Nolan, the clinic manager, explained to T.G. that Linne was not available, and T.G. became agitated with her. T.G. both telephoned Southern Hills and came to the premises on November 19, 20, and 21. On November 26, T.G. returned and met with Michael Cepic, a case manager. They met for several hours, with the purpose of providing assistance to T.G. in getting food stamps. On November 27, T.G. appeared again at Southern Hills, wanting to see if an emergency therapist could talk with him. While waiting, T.G. saw case manager Angie Hill ("Hill") outside the facility in the parking lot. Hill ultimately filled out an incident report that indicated she saw T.G. pacing the premises outside, and he approached her and complained about his situation. Because she was consulting with another client at the time, she tried to explain she could not meet with him. He followed Hill as she walked to her car, and he prevented her from closing the door. Eventually, he slammed her door but continued swearing at her. T.G. then entered the building and staff arranged with T.G. that he should come back on November 28, to meet with Doug Hayworth ("Hayworth"), a licensed social worker. T.G. returned as scheduled to meet with Hayworth, but during that meeting, T.G. became angry and attempted to make a citizen's arrest on Hayworth for being a fraud, and T.G. called the police. An officer arrived at the scene, and T.G. was verbally abusive to the officer. T.G. left the premises, but Hayworth felt T.G. was gravely disabled and acutely psychotic.

3

Therefore, on November 28, 2012, Hayworth filed an application for the emergency detention of T.G., which alleged that T.G. was gravely disabled and a danger to himself and others. The trial court granted the application on the same day. On November 29, Jasper police picked up T.G. and transported him to Memorial Hospital Behavioral Health Unit ("Hospital") in Jasper, Indiana, where he was admitted.

An evidentiary commitment hearing was held at the Hospital on December 4, 2012; present at the hearing were T.G. and his counsel, along with Southern Hills personnel Hayworth and treating psychiatrist Robert L. White, M.D. ("Dr. White"). Dr. White testified that his diagnosis for T.G. was that he suffered from schizoaffective disorder and bipolar disorder and that T.G. was gravely disabled. Hayworth testified as to events leading up to Hayworth's emergency petition for detention.

After the hearing, the trial court issued an Order of Regular Commitment ("December Order"), finding that (1) T.G. suffers from schizoaffective disorder, bipolar type versus bipolar I disorder with psychotic features, (2) T.G. is gravely disabled as defined in Indiana Code section 12-7-2-96, (3) T.G. is in need of commitment to an appropriate facility for a period expected to exceed ninety days, and (4) the appropriate facility is Southern Hills. *Appellant's App*. at 39. The December Order committed T.G. to Southern Hills "until he is discharged or the Court terminates the commitment." *Id*. The trial court also issued Additional Findings Pursuant to Regular Commitment Order for Out-Patient Treatment ("Additional Findings") stating, among other things, that: (1) T.G. admitted that he did not regularly take prescribed medications while on prior temporary commitment; (2) Dr. White testified that the prescribed medications will be of substantial

benefit in treating T.G.'s condition; and (3) although T.G. opposed medication by injection, the benefits of giving T.G. the medications by injection outweigh the risks and personal concerns of T.G., and there exists no less restrictive alternative treatment. The Additional Findings also ordered that "medication by injection shall occur during the regular commitment." *Id.* at 38. The same date, the trial court also issued Conditions Pertaining to Order of Regular Commitment for Out-patient Treatment ("Conditions"), which required T.G. to take all prescribed medications, participate in medication monitoring, not consume alcohol or illicit substances, allow for random drug screens, live in housing approved by Southern Hills, and if housed in Southern Hills, required T.G. to participate in the patient trust account. *Id.* at 44.

The trial court received correspondence from T.G. in early January 2013, asking for an ex-parte hearing. Instead, the trial court set the matter for a review hearing on January 10, 2013, in order to allow T.G. to present additional evidence. The January 10 hearing was started but not completed, and after a series of conflicts and continuances, the matter was concluded at an April 30 hearing, which – like the December 4 hearing – was conducted in a room designated and used as a courtroom at the Hospital. While T.G. requested at the January 10 hearing that the trial court hold a public hearing, the trial court denied the request explaining that mental health hearings are not public and that holding the hearing at the Hospital was logistically easier for witness purposes, rather than requiring doctor(s) and social worker(s) to travel to the courthouse. At the conclusion of the April 30 hearing, the trial court took the matter under advisement.

On May 23, 2013, the trial court issued an Order of Regular Commitment ("May Order"), essentially identical to its December Order, in which it ordered a regular commitment of T.G. to Southern Hills for a period to exceed ninety days, and the trial court also issued corresponding Conditions and Additional Findings, just as it had in December 2012. T.G. now appeals.

## DISCUSSION AND DECISION

### I.     Regular Commitment and Conditions

Civil commitment is a significant deprivation of liberty, and it requires due process protections. *In re Commitment of S.T. v. Cmty. Hosp. N.*, 930 N.E.2d 684, 687 (Ind. Ct. App. 2010); *In re Commitment of C.J. v. Health & Hosp. Corp. of Marion Cnty.*, 842 N.E.2d 407, 409 (Ind. Ct. App. 2006). To satisfy the requirements of due process, the State must prove the facts justifying an involuntary commitment by clear and convincing evidence. *S.T.*, 930 N.E.2d at 687. Specifically, for a person to be involuntarily committed, the petitioner must prove by clear and convincing evidence that (1) the individual is mentally ill and either dangerous or gravely disabled and (2) commitment is appropriate. Ind. Code § 12-26-2-5(e); *see also* Ind. Code § 12-26-7-1 (concerning regular commitment).

Indiana Code section 12-7-2-130 defines mental illness as a psychiatric disorder that "(A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Because symptoms of mental illness can range from the benign to the severe, the determination whether an involuntary commitment is appropriate is fact-sensitive. *S.T.*, 930 N.E.2d at 689-90. "Dangerousness" for our

6

purposes is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53. The determination of dangerousness under the involuntary commitment statute is a question of fact for the trial court to decide. *S.T.*, 930 N.E.2d at 689. "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *T.K.*, 993 N.E.2d at 249. "Gravely disabled" is defined as a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual: (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently. Ind. Code § 12-7-2-96; *In re Commitment of A.W.D.*, 861 N.E.2d 1260, 1265 (Ind. Ct. App. 2007), *trans. denied*.

Upon review of an order for involuntary commitment, we will consider only the evidence favorable to the judgment and all reasonable inferences therefrom. *S.T.*, 930 N.E.2d at 687-88; *C.J.*, 842 N.E.2d at 409. We may not reweigh the evidence or judge the credibility of the witnesses. *S.T.*, 930 N.E.2d at 688; *A.W.D.*, 861 N.E.2d at 1264. A trial court is not required to wait until an individual commits a physical act before determining that the individual poses a substantial risk of harm to others. *In re Commitment of M.Z. v. Clarian Health Partners,* 829 N.E.2d 634, 638 (Ind. Ct. App. 2005), *trans. denied*. We will affirm the trial court's commitment order if it represents a conclusion that a reasonable person could have drawn, even if other reasonable conclusions are possible. *S.T.*, 930

7

N.E.2d at 688; *C.J.,* 842 N.E.2d at 409 (citing *In re Commitment of Heald,* 785 N.E.2d 605, 613 (Ind. Ct. App. 2003), *trans. denied*).

On appeal, T.G. contends that the May Order of regular commitment is not supported by the evidence. He claims there was no substantial evidence that proved he was dangerous or gravely disabled, arguing that he has a limited prior mental health treatment history, did not exhibit a "total refusal" to accept mental health treatment, his anger was not shown to be the result of a mental disorder, and there was no "firm evidence" that his refusal to take medication resulted in a harmful effect. *Appellant's Br.* at 4. T.G. also challenges several of the Conditions that the trial court placed upon his outpatient treatment.[3] As we explained in *Golub v. Giles*, 814 N.E.2d 1034, 1040 (Ind. Ct. App. 2004), *trans. denied*:

> When an individual enters a mental health facility as an in-patient, he must follow the facility's rules, policies, and procedures. Thus, it is up to the facility, not the trial court, to impose conditions on the patient such as attending therapy sessions, taking prescribed medications, and abstaining from drug and alcohol use. If and when the trial court orders the individual to take part in out-patient therapy, then it may be appropriate for the court to place special conditions on the individual.

T.G. asserts there was not clear and convincing evidence presented to support the following Conditions: (1) he may not use alcohol or illicit substances; (2) he must live in housing approved by Southern Hills; and (3) medication by injection shall occur during regular commitment.

---

[3] The caption of the trial court's Conditions indicates that they pertain to T.G.'s outpatient treatment. *Appellant's App.* at 79. We presume, then, that the trial court intends the Conditions to apply following T.G.'s inpatient regular commitment, stated to last in excess of ninety days.

8

Here, the evidence presented to the trial court demonstrated that T.G. had been diagnosed as having schizoaffective disorder and bipolar disorder. It appears that he began having issues related to his mental health as early as junior high school. In January 2011, when he was twenty-six years old, he received psychiatric care, and he was subject to an emergency detention in November 2011. In the weeks leading up to the current November 2012 commitment, the evidence was that there had been continued and escalating conflict with his parents, sometimes resulting in his parents calling police. His mother reported that T.G. threw cups of coffee at her at home and also was angry at her when they met at a Wendy's restaurant, and he threw food at her vehicle, attracting the attention of other customers who checked with her to make certain she was safe. *Appellant's App*. at 18.

T.G. had lost his most recent job, and had also lost prior jobs, one of which T.G.'s mother told therapists was because he pulled a knife on another employee. Eventually, T.G. could not pay rent and moved into a tent on some family-owned wooded property. His parents contacted police to check on him; T.G. interpreted this as a sign that both his parents and the police were out to get him. He voluntarily went to Southern Hills on a number of occasions, he says to seek their help in getting his parents to leave him alone and also to assist him with obtaining food stamps.

The various reports indicate that he was verbally aggressive and angry with staff at Southern Hills. On November 27, 2012, caseworker Hill felt threatened when T.G. followed her to her car and prevented her from closing the door. The following day, T.G. attempted to make a citizen's arrest of Hayworth, who he accused of being a fraud. Upon his admittance to Southern Hills after the emergency commitment, T.G. continued to be

9

verbally aggressive with nurses, sometimes necessitating security to calm him. Dr. White's reports characterized T.G. as verbally aggressive, intrusive, irritable, argumentative, and as suffering from auditory and visual hallucinations, paranoid thoughts, and noted that T.G.'s judgment and insight were impaired. T.G. talked with Dr. White about the police following him and his parents and Southern Hills committing wrongs against him. T.G. also admitted to Dr. White that he smoked pot frequently.

The evidence also reflected that during his previous 2011 commitment, T.G. had been noncompliant with outpatient treatment, which led to relapse. T.G. dropped out of treatment and did not fill his prescriptions. In fact, at the December 4, 2012 hearing, T.G. candidly admitted, "I very rarely took the medications they were giving me." *Tr. Dec. 4, 2012 hearing*.[4] Although T.G. visited the "drop in center" at Southern Hills so they could monitor his medicine intake, he did not actually consume the medicines, stating, "I very rarely kept my medicines inside me[.]" *Id.* Dr. White testified that if T.G. did not take medication, he would remain gravely disabled and that the only two options available were oral medications or injectable medications. Because of T.G.'s history of not taking his oral medications, as well as the inability of Southern Hills to monitor his consumption of the medications on the weekends, Dr. White recommended injectable medications, which T.G. opposed.

In its December Order, the trial court found that T.G. suffered from the diagnosed illnesses, was gravely disabled, was in need of commitment to an appropriate facility,

---

[4] Transcripts of some hearings are paginated, while others are not; the Transcript of the December 4, 2012 does not include page numbers.

namely Southern Hills, as the least restrictive environment suitable for his necessary care, treatment, and protection of himself and others. The trial court also issued Conditions associated with his commitment, such as requiring T.G. to take all medication as prescribed, submit to random alcohol and illicit substance screens, and live in Southern Hills or housing approved by it. Because medication was a necessary part of his treatment plan, and T.G. had exhibited an unwillingness to take medications, the court found by clear and convincing evidence that injections were necessary.[5] *Tr. Hearing of Dec. 4, 2012*. The trial court explained, "And that way, [the medications] will be given to him, he can't hide them, he can't refuse them, and that way we can also observe his behavior to make a good assessment whether those medications are helping him." *Id.*

T.G. sent correspondence to the trial court in January 2013 requesting an ex-parte hearing. In order to accommodate T.G.'s request to present additional evidence, the trial court set the matter for a hearing in January 2013, which was started but not completed, and the matter resumed and was completed in April 2013. T.G. was represented by counsel at the hearings. During these proceedings, the trial court accepted evidence from T.G., among others. T.G. maintained, "I am not mentally ill," and his evidence included documents that outlined his version of the incidents involving his mother, police, and Southern Hills personnel, wherein he alleged that he was misunderstood, Southern Hills was not attentive to his needs, and that Southern Hills exaggerated or mischaracterized

---

[5] Although special conditions pertain only to a patient's outpatient treatment, we note that the requirement that T.G. receive medication by injection is one of the trial court's Additional Findings, not a Condition; as such, the trial court's directive concerning medication by injection was not limited only to T.G.'s outpatient care.

events. *Appellant's App*. at 55. However, as previously stated, we are bound to view only that evidence that is most favorable to the trial court's judgment. *S.T.*, 930 N.E.2d at 687-88; *C.J.*, 842 N.E.2d at 409.

In light of the evidence presented to the trial court over the course of several hearings, including the personal observations of medical experts familiar with T.G.'s case, we conclude that the trial court's May Order of regular commitment of T.G., the Conditions, and the Additional Findings were supported by the evidence. *See In re Commitment of T.K.*, 993 N.E.2d 245, 250 (Ind. Ct. App. 2013) (T.K. was properly committed where he had been diagnosed with chronic paranoid schizophrenia, treated for mental illness in the past and subject to commitment, denied that he suffered from mental illness, and refused medication), *trans. pending*; *In re Commitment of M.M. v. Clarian Health Partners,* 826 N.E.2d 90, 98 (Ind. Ct. App. 2005) (M.M. was properly committed where she had been diagnosed with bipolar mania but had no insight into her illness or the necessity of taking medication), *trans. denied*.

## II.    Request for Public Hearing

On January 10, 2013, the trial court held a short hearing at the courthouse in response to T.G.'s correspondence that he had sent to the trial court following the December 4, 2012 commitment order. At the January 10 hearing, T.G. explained to the trial court that he desired to present additional documentary and testimonial evidence. In order to accommodate this request, the trial court agreed to schedule another hearing at the hospital, at which Hayworth and Dr. White would also be present and called to testify

12

again. T.G. asked the trial court to hold a public hearing at the courthouse, rather than a closed hearing held at the hospital. The trial court explained,

> These are not open to the public. And if we had the hearing here, it would not be open to the public. We have it [at the hospital] because it is easier for me to go there than to have two or three or four . . . usually it's the patient, as well . . .[] come here. So that [is] basically an extension of this Court.
> . . . .
> There's nobody from the public that can come in here for mental health because the records are not open to the public. . . . I have the hearings up there [at the hospital] because it's more convenient[]. I'm the only person who has to show up there, rather than having two or three people come here.

*Tr. Jan. 10, 2013 hearing* at 9-10. T.G. disagreed "with the constitutionality of that" but ultimately agreed to it. *Id.* at 10. He argues on appeal that his request to have a public hearing should have been granted. Specifically, T.G. asserts that his procedural due process rights were violated, and the commitment order should be set aside.

Indiana Code section 16-39-2-3 provides that mental health records are confidential and, but for certain exceptions, may only be disclosed with the consent of the patient. While T.G. argues that he consented to the disclosure, the trial court was presented with what it determined to be clear and convincing evidence that T.G. was gravely disabled due to mental illness. T.G. has failed to identify how his procedural due process rights were violated by the closed hearings, beyond merely making the allegation that his rights were violated. Therefore, he has waived the claim by failing to make a cogent argument. Indiana Appellate Rule 46(A)(8); *In re Commitment of M.E. v. V.A. Med. Ctr.*, 957 N.E.2d 637, 640 (Ind. Ct. App. 2011).

Waiver aside, we find no error in the trial court's manner or process of the commitment of T.G. Indiana Code section 12-26-2-2 identifies rights of those alleged to

have a mental illness requiring commitment, including the right to receive adequate notice of a hearing, the right to be present at the hearing, unless determined to be disruptive or injurious to his or her well-being, and the right to be represented by counsel. The individual also shall be given the opportunity to testify at hearings, and to present and cross-examine witnesses. Ind. Code §12-26-2-3. Pursuant to Indiana Code section 12-26-6-5, the trial court may hold the hearing "at a facility or other suitable place not likely to have a harmful effect on the individual's health or well-being." In this case, T.G. had the benefit of multiple hearings. In fact, the trial court granted T.G. two additional hearings after the December 4, 2012 hearing and December Order, namely hearings on January 10, 2013, and April 30, 2013. T.G. and his counsel were present at all three hearings. They presented testimonial and documentary evidence, and they cross-examined witnesses. We find nothing that calls into question the reliability of the outcome of the proceeding, no basis to remand for a new, public hearing, as requested, and discern no trial court error.

Affirmed.

ROBB, C.J., and RILEY, J., concur.