**In the Matter of The COMMITMENT OF M.M., Appellant–Respondent,**

v.

**CLARIAN HEALTH PARTNERS, Appellee–Petitioner.**

No. 49A05–0408–CV–466.

Court of Appeals of Indiana.

April 26, 2005.

Rehearing Denied May 23, 2005.

Joel M. Schumm, Indianapolis, IN, Attorney for Appellant.

Michele J. Calderon, Indianapolis, IN, L. Alan Whaley, Brian E. Bailey, Ice Miller, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

M.M. appeals an order involuntarily committing her to a mental health facility as an inpatient. She presents the following restated issues for review:

1. Did the trial court improperly rely on hearsay testimony to support the involuntary commitment?

2. Was the involuntary commitment order supported by sufficient evidence?

3. Did the trial court improperly impose special conditions of commitment?

We affirm in part and reverse in part.[1]

It is undisputed that M.M. led a high-functioning, productive life for well over sixty years, with no apparent signs of mental illness. She has given of herself to the community through her thirty-year career as a registered nurse, a career from which she has recently retired, and through the many foster children and abused families she has taken in and cared for over the years. Unfortunately, last summer M.M.'s life was altered, at least temporarily, through no fault of her own.

On July 16, 2004, M.M. underwent surgery to have a benign tumor removed from her spine. The surgery was complicated by the location of the tumor, and a large hematoma developed that caused significant pain and some one-sided paralyses. This required another surgery on July 21 to remove the hematoma. As part of her pre- and post-surgical treatment, she received high doses of steroids.

Following a disturbance involving M.M. on August 2, police detained M.M. and took her to Wishard Hospital in Indianapolis. M.M. was transferred later that evening to Methodist Hospital's inpatient psychiatric unit pursuant to an application for emergency detention.[2] On August 5, Clarion Health Partners (Clarion) filed a Petition for Involuntary Commitment (the Petition). Clarion alleged in the Petition that M.M. was suffering from a psychiatric disorder and that as a result of her condition she presented a danger to herself or others. In the physician's statement attached to the Petition, Doctor Craig Erickson

---

1. We heard oral argument on February 25, 2005, in Indianapolis. We commend counsel on the exceptional quality of their written and oral advocacy in this matter.

2. Two days earlier, on July 31, M.M. had been a voluntary patient in the inpatient psychiatric unit and signed herself out of Methodist against medical advice.

opined M.M. was suffering from "acute mania with delusions and agitation" and recommended temporary commitment of M.M. to Methodist Hospital's inpatient unit. *Appellant's Appendix* at 18.

The trial court held a commitment hearing on August 10, at which Dr. Erickson testified for Clarion in support of the commitment. Dr. Erickson treated M.M. between August 3 and August 6. At the hearing, he opined that M.M. was suffering from bi-polar mania secondary to steroids. Dr. Erickson explained it was his belief the steroids were the catalyst that triggered her manic episode and exacerbated an underlying bi-polar condition. He described M.M.'s behavior during her emergency commitment as follows:

> While she's been inpatient with us, her behavior has been very erratic, impulsive, intrusive. Some examples of this, are that the patient frequently screams while on the unit, both at staff, physicians, nurses, other support staff, and at other patients. She frequently interrupts other conversations of the hospital personal [sic] also. She appears to be very confused, screaming such things out at us. "I only trust black babies, I hate white people". At one point she offered me personally twenty thousand ($20,000.00) dollars to sign her release order, saying that she would float alone [sic] to do this. She also . . . said to me and to Dr. Gilbert that she's, "Running the unit", and that she knows what's best for every patient on the floor. She's told other patients what they should and shouldn't eat, what medications they should and shouldn't take. While interviewing other patients, [M.M.] has frequently interrupted me, called me a liar, said that I was a terrible doctor, and told the patients that I had been talking to that they shouldn't listen to a thing that I say. At one point that she was interrupting and screaming and [sic] me while I was talking with another patient, I had to have security escort her back to her room. Her speech is consistently very loud and pressured, which is a medical term for very rapid, and she often refers to herself as being a spitfire, which I'm not exactly sure what that means, but it's generally erratic, confused, irritable, angry, and very disruptive.

*Transcript* at 17–18. Dr. Erickson testified this behavior was consistent with manic episodes.

Dr. Erickson further testified that M.M. had "absolutely no insight into [her] diagnosis". *Id.* at 20. He explained that on a regular basis M.M. refused to take her medicine because she believed nothing was wrong with her. She even told Dr. Erickson that she would "rather die" than take the prescribed medicine. *Id.* at 19. On multiple occasions, she threw her medication at Dr. Erickson or at others nearby.

Based upon his observations (including M.M.'s threatening and interrupting behavior in the unit) and M.M.'s diagnosis, Dr. Erickson opined M.M. was a danger to herself and others. He explained, however, that with medication and treatment M.M. would have a very good chance of successfully stabilizing her mood and actions. He estimated that M.M. could show symptomatic improvement in a matter of weeks—not months—and then be discharged to outpatient treatment and follow-up. Absent an order of temporary commitment, Dr. Erickson testified the prognosis would be "very poor" and, given her behavior in the hospital and her diagnosis, she would pose "a threat to herself and other people in the community." *Id.* at 23.

Following Dr. Erickson's testimony, M.M. called her dentist of ten years and then a long-time friend to testify on her

behalf. Both witnesses testified to M.M.'s good works and achievements. They also testified that they had not seen any signs of mental illness in their past experiences with M.M., though her dentist had not seen her for several months and her friend had not seen her during the alleged manic episode. M.M. also testified on her own behalf and denied she was experiencing a manic episode.

■ At the conclusion of the hearing, the trial court issued an Order of Temporary Commitment. The court ordered M.M. committed as an inpatient at Methodist for not more than ninety days, with a follow-up course of treatment at an appropriate outpatient facility. The court also ordered a number of special conditions of commitment. M.M. now appeals. Additional facts will be provided as necessary.[3]

### 1.

■ M.M. initially argues that the commitment is fundamentally flawed because the trial court relied on hearsay evidence of events that took place prior to the emergency commitment. She argues this evidence was improperly admitted through the testimony of Dr. Erickson, who had no personal knowledge of the events.

At the hearing, Dr. Erickson testified to the events that led to M.M.'s emergency commitment, information he obtained from medical records compiled during her initial detention at Wishard. M.M. offered a timely and detailed objection to the admission of said evidence at the hearing.[4] The trial court allowed the evidence "as far as, use for diagnosis, but not what someone said". *Transcript* at 11. Dr. Erickson then proceeded to explain the circumstances that resulted in M.M. being brought to Wishard:

> I read in the medical record that the patient jumped from a moving car, then while in the street was almost hit by an ongoing bus, then ran down the street into a bank where she began to be threatening toward bank patrons, actually took a patrons [sic] cane and waved

---

**3.** We note that M.M. has been discharged from the hospital for some time now. While we generally dismiss cases that are deemed to be moot, a moot case may be decided on its merits when it involves questions of great public interest that are likely to recur. *Golub v. Giles*, 814 N.E.2d 1034 (Ind.Ct.App.2004), *trans. denied*. This is such a case.

**4.** At the hearing, M.M.'s counsel argued in part:

> I would object to hearsay as to what the police officers or other witnesses at that scene, may of [sic] reported that ended up in the charts that weren't witnessed by staff with personal knowledge of those events.
>
> * * *
>
> Even if it's in the medical record, he can use that for purposes of forming a diagnosis then. It's inappropriate to bring it into commitment proceedings based on hearsay objections, because it would not be reliable unless it was witnessed by medical staff, and had personal knowledge of those events

rather than just related to them for purposes of forming a diagnosis.

> * * *
>
> So, I have no objection to what the Wishard staff personally observed and documented, or to what the Methodist doctor personally observed and documented. My objection is to, not been [sic] using those events as a basis for diagnosis, but bringing those events into the commitment proceedings as part of the basis for a commitment.
>
> * * *
>
> [M]y objection is to not using events that were not witnessed by hospital staff to commit someone when we just don't have those witnesses here from the street here today, in order to get a more accurate picture. All we have is a version that was given to someone at the hospital that was then given to someone else at the hospital, and it was actually.... I'm saying it's inappropriate to bring it [as a basis for a commitment] when those people could have been here today.

*Transcript* at 7–11.

it around, thus causing a disturbance that police personal [sic] responded to, and then took her to Wishard Hospital. *Id.* at 13. The application for emergency detention and the petition for involuntary commitment both recount similar facts. At the conclusion of the hearing, the trial court indicated commitment was needed in light of M.M.'s two manic episodes. In addition to M.M.'s behavior while committed, the court noted as another manic episode "when she's been out running around where she could be a danger to herself." *Id.* at 47.

Clarion asserts the trial court was free to consider all the evidence presented at the hearing, as well as the detention documents maintained in the record. Moreover, Clarion argues our courts have routinely permitted expert medical witnesses in commitment hearings to rely on past detentions and medical records in formulating opinions regarding a patient's mental condition.

M.M. has never contested Dr. Erickson's ability to consider inadmissible hearsay in formulating his expert opinion regarding a patient's mental condition. *See* Ind. Evidence Rule 703 ("[e]xperts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field"); *see also Schmidt v. State,* 816 N.E.2d 925 (Ind. Ct.App.2004) (while this rule allows an expert to testify to opinions based on material not before the trier of fact, it does not expressly provide a vehicle by which the trier of fact can learn of the underlying material). Rather, M.M. correctly argues such hearsay cannot serve as substantive evidence to support an involuntary commitment. *See Faulkner v. Markkay of Indiana, Inc.,* 663 N.E.2d 798, 801 (Ind.Ct.

App.1996) ("[t]he evidence rules do not permit the admission of materials, relied upon by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible"), *trans. denied.*

In their briefs and at oral argument, both parties have directed us to *Golub v. Giles,* 814 N.E.2d 1034. In that case, we observed that pursuant to statute, a trial court may involuntarily commit an individual after completion of the hearing and consideration of the record. *Id.; see also* Ind.Code. Ann. § 12–26–6–8 (West 2001). We went on to state:

> Thus, the trial court could have properly considered any information contained in the record, including, presumably, all previous applications for and reports following Golub's emergency detentions[5]—all of which were included in Golub's appendix.

*Golub v. Giles,* 814 N.E.2d at 1039. Based upon *Golub,* Clarion asserts the record includes the detention documents, which recount the events leading to M.M.'s detention.

We do not believe *Golub* intended to cast a net broad enough to allow inadmissible hearsay to be used as substantive evidence. In a temporary commitment proceeding, the trial court is expressly entitled to consider "the record" in addition to evidence presented at the commitment hearing. I.C. § 12–26–6–8. The official court record may include evidence from prior hearings, as well as past and present applications for emergency detention, reports following emergency detention, petitions for involuntary commitment, and orders of commitment. When documents in the record contain otherwise inadmissi-

---

**5.** Golub had a five-year, well-documented history of mental illness and emergency detentions.

ble hearsay, however, that information cannot properly be used as substantive evidence to support a commitment.

■ In the instant case, the detention documents contain third-party statements concerning the events leading to M.M.'s detention. The original source of this information was never established below, and it appears as though the information involves several layers of hearsay.[6] Thus, M.M. had no opportunity to test the reliability of this information through cross-examination[7] and impeachment of the declarant, and the information's reliability is not self-evident. *See generally In re E.T.*, 808 N.E.2d 639, 641 (Ind.2004) (noting that exceptions to the hearsay rule have "generally been based upon some combination of the unavailability of the declarant, the reliability of the declaration, or the presumed inefficiency of any possible cross-examination"). The trial court erred to the extent it considered this information as substantive evidence. Nevertheless, we find this error to be harmless, as discussed more fully below, because Dr. Erickson's testimony regarding his personal observations of M.M. during her detention adequately supports the commitment order. *See In re E.T.*, 808 N.E.2d 639.

2.

M.M. argues Clarion presented insufficient evidence to support the commitment. M.M. notes that at sixty-four years of age, she had never before been treated for or displayed any symptoms of mental illness and "at most exhibited loud and interrupting behavior" during her involuntary detention at Methodist. *Appellant's Brief* at 10.

■ When reviewing a challenge to sufficiency of the evidence with respect to commitment proceedings, we look to the evidence most favorable to the trial court's decision and draw all reasonable inferences from that decision. *Golub v. Giles*, 814 N.E.2d 1034. We neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible. *Id.*

■ Civil commitment is a significant deprivation of liberty that requires due process protections. *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). In commitment proceedings, therefore, the burden falls on the petitioner (here Clarion) to prove by clear and convincing evidence that the individual is mentally ill and either dangerous or gravely disabled. I.C. § 12–26–2–5(e) (West 2001).

■ M.M. initially challenges the trial court's determination that she is mentally ill. For the purpose of a temporary civil commitment, "mental illness" is defined as "a psychiatric disorder that: (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." Ind.Code Ann. § 12–7–2–130 (West 2001).

There are several aspects of Dr. Erickson's testimony from which a reasonable person could conclude that M.M. was mentally ill at the time of the commitment hearing. Dr. Erickson diagnosed M.M. as suffering from bipolar mania, an illness he

6. Most likely, police officers reported to Wishard what witnesses had reported at the scene, and Wishard in turn reported this information to Methodist. This information then found its way into the detention documents.

7. An individual alleged to be mentally ill is entitled to cross-examine witnesses at the commitment hearing. *See* I.C. 12–26–2–3 (West 2001).

also termed steroid-induced bipolar mania. Dr. Erickson went on to describe the "erratic, confused, irritable, angry, and very disruptive" behavior he observed during M.M.'s emergency commitment, behavior consistent with a manic episode. *Transcript* at 18. He further testified to M.M.'s refusal to take medication, her lack of insight into her diagnosis, and her poor judgment.

We note that M.M. does not appear to contest the fact that bipolar mania is a mental illness, as defined by statute. Rather, she simply disputes the accuracy of Dr. Erickson's diagnosis by pointing to her lack of prior treatment or diagnosis for bipolar disorder. Dr. Erickson acknowledged this but testified that it is not unusual to diagnose bipolar disorder late in life. We refuse to reweigh the evidence. Moreover, we find M.M.'s citation on appeal to various internet articles on the topic of bipolar disorder neither helpful nor persuasive. While the articles may provide general background information, they are not part of the record and do not equip us with the ability to question or supersede a diagnosis by a licensed medical doctor made after: 1) a review of M.M.'s medical record; 2) his examination and personal observations of M.M. during treatment; and, 3) interviews with M.M.'s friends and associates. In light of Dr. Erickson's testimony at the commitment hearing, the trial court could reasonably conclude that M.M. suffered from a mental illness, specifically bipolar mania. *See In re Heald*, 785 N.E.2d 605 (Ind.Ct.App. 2003), *trans. denied*.

■ M.M. also challenges the trial court's finding that she was dangerous at the time of the commitment hearing. M.M. asserts that, at most, she displayed some loud and abrasive behavior while being involuntarily detained in the psychiatric ward at Methodist. She argues this type of behavior does not suggest any risk, let alone a substantial risk, that she would harm herself or others.

■ "Dangerousness" for our purposes is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53 (West 2001). "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *Commitment of C.A. v. Center for Mental Health*, 776 N.E.2d 1216, 1218 (Ind.Ct.App.2002).

■ We recognize the extraordinary curtailment of liberty involved with a commitment to a mental hospital. *See Commitment of Gerke*, 696 N.E.2d 416 (Ind.Ct. App.1998). Because everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. *Id.* "There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *Commitment of J.B. v. Midtown Mental Health Center*, 581 N.E.2d 448, 451 (Ind.Ct.App.1991), *trans. denied*.

In the instant case, M.M.'s behavior during her emergency detention cannot be described simply as idiosyncratic. A review of the record reveals the behavior observed by Dr. Erickson was the result of M.M.'s mental illness, which had recently been triggered by the high doses of steroids she had been on before and after surgery. M.M.'s own witness described her as "very mild mannered" in the years before the surgeries. *Transcript* at 28.

M.M. was anything but mild mannered while at Methodist. Dr. Erickson de-

scribed her behavior as very erratic, impulsive, confused, angry, and intrusive. For example, he testified M.M. frequently screamed at staff, physicians, nurses, and patients in the unit. She interfered with the treatment of other patients on a regular basis. On one occasion, M.M. screamed so loudly at Dr. Erickson while he was talking with another patient that M.M. had to be escorted by security personnel back to her room. On multiple occasions M.M., instead of taking her medication, threw it at Dr. Erickson or others nearby. Dr. Erickson testified M.M. had no insight into her illness or the necessity of taking her medication. Based upon his personal observation of M.M. and the diagnosis, Dr. Erickson opined that M.M. posed a danger to herself and others and that her prognosis was "very poor" without treatment. *Id.* at 23.

In light of this evidence, the trial court could properly find that as a result of her mental illness, M.M. was dangerous. *See Jones v. State,* 477 N.E.2d 353, 360 (Ind. Ct.App.1985) (sufficient evidence of dangerousness found where patient was "verbally assaultive and physically threatening to such a degree that she was sequestered from other patients"), *trans. denied.* Therefore, we conclude the commitment order was supported by clear and convincing evidence.[8]

### 3.

▮ Finally, M.M. claims the trial court improperly imposed special conditions of commitment. She notes the conditions were not requested by Dr. Erickson, were not based upon Dr. Erickson's assessment of M.M., and bore no relationship to the reasons for her commitment.

The trial court ordered the following special conditions:

1. Take all medications as prescribed.
2. Attend all clinic sessions as scheduled.
3. Maintain her address, and her telephone number, on record, if and when Respondent is placed on outpatient commitment.
4. Not harass or assault family members or others.
5. Not use alcohol, or drugs, other than those prescribed by a licensed medical doctor.

*Appellant's Appendix* at 6. With the exception of the third condition, the order does not specify whether the conditions are to be imposed upon M.M. as an inpatient or outpatient.

M.M. challenges all of the conditions as they relate to her as an inpatient and the fourth and fifth conditions as they relate to her release as an outpatient. In light of our recent decision in *Golub v. Giles,* 814 N.E.2d 1034, Clarion concedes that the inpatient conditions are improper, as well as the fifth outpatient condition regarding alcohol and drug use. Clarion argues that the fourth outpatient condition was properly entered based upon the evidence presented at the commitment hearing.

In *Golub,* we held that a trial court may not impose special conditions on the involuntary commitment of an individual as an inpatient. We explained that when an individual enters a mental health facility as an inpatient, she must follow the facility's rules, policies, and procedures. *Id.* "Thus, it is up to the facility, not the trial court, to impose conditions on the patient such as attending therapy sessions, taking prescribed medications, and abstaining from drug and alcohol use." *Id.* at 1040.

---

8. Because we find sufficient evidence of dangerousness, we need not address the propriety of the trial court's determination that M.M. was gravely disabled. *See Commitment of C.A. v. Center for Mental Health,* 776 N.E.2d 1216.

Therefore, the special conditions were improper to the extent they applied to M.M. while she was an inpatient at Methodist.

Conversely, it is appropriate for a trial court to place conditions on an individual upon her release as an outpatient. *Golub v. Giles,* 814 N.E.2d 1034 (citing I.C. § 12–26–14–3 (West 2001)). The conditions, however, "must be reasonably designed to protect the individual as well as the general public." *Id.* at 1041. With respect to the condition prohibiting M.M. from consuming alcohol or drugs, we observe the record is devoid of any evidence showing M.M. used or abused alcohol or drugs. The subject of alcohol or drug use was never raised during the hearing. Because there is no evidence in the record to suggest that such a prohibition bears any relationship to M.M.'s treatment or the protection of the public, we agree with the parties that the condition was improperly imposed. *See Golub v. Giles,* 814 N.E.2d 1034.

On the other hand, the trial court properly imposed the special condition preventing M.M. from harassing or assaulting others as an outpatient because there is evidence in the record to support such a condition. Dr. Erickson's testimony reveals M.M. harassed and assaulted medical staff and other patients on a number of occasions. In particular, she threw medication at others and frequently screamed at staff, physicians, nurses, and other patients in the unit. On one occasion her disruptive behavior resulted in her being escorted back to her room by security. This evidence supports a conclusion that this special condition bears a reasonable relationship to M.M.'s treatment and to protection of the public. *See id.*

The judgment of the trial court is affirmed in part and reversed in part with instructions to strike all special conditions from the order of commitment insofar as they apply to M.M.'s inpatient care and to strike the special condition prohibiting M.M. from consuming alcohol and drugs from the order of commitment altogether.

BAKER, J., and SHARPNACK, J., concur.