## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 07 2015, 10:04 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Stuart K. Baggerly
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

James L. Whitlatch
Kathryn DeWeese
Bunger & Robertson
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Involuntary Commitment of

R.R.

*Appellant-Respondent,*

v.

Indiana University Health Bloomington Hospital,

*Appellee-Petitioner*

August 7, 2015

Court of Appeals Case No. 53A05-1501-MH-19

Appeal from the Monroe Circuit Court

The Honorable Stephen R. Galvin, Judge

Cause No. 53C07-1412-MH-419

**Bailey, Judge.**

# Case Summary

[1] R.R. appeals an order involuntarily committing her to IU Health Bloomington Hospital ("IU Health") and authorizing injections of medication. She challenges the sufficiency of the evidence to support the determination that she is gravely disabled or to support forced medication. We affirm.

# Facts and Procedural History

[2] R.R. is a forty-nine-year-old woman who has been diagnosed as schizophrenic. On December 13, 2014, R.R. called for an ambulance to take her to a hospital emergency room. R.R. had experienced prolonged sleep deprivation after becoming upset with her son, which she described as "very devastating." (Tr. at 21.) The ambulance call had been preceded by at least five recent calls from R.R. to police requesting safety checks. One of the responding officers had noted that R.R.'s house was "extremely unkept [sic] with a dog and eight cats, knee deep debris and trash and feces and the county may be taking action to condemn the house." (Tr. at 29.)

[3] On December 16, 2014, IU Health filed a petition for involuntary commitment, attaching the report of Dr. Carey Mayer ("Dr. Mayer"). Dr. Mayer opined that R.R. was suffering from a psychiatric disorder which substantially disturbs her thinking, feeling or behavior and impairs her ability to function. More specifically, he noted: "very psychotic, has paranoid delusions, and likely hallucinations, has very poor judgment, not taking meds." (App. at 7.)

[4] A commitment hearing was conducted on December 19, 2014, at which Dr. Mayer and R.R. testified. Dr. Mayer testified that R.R. was "unable to ensure her own safety and shelter," was hearing voices, and was "afraid of her home." (Tr. at 7.) For example, R.R. believed that there were "people peeing down her chimney." (Tr. at 7.) According to Dr. Mayer, R.R. had a history of non-compliance with medication and would best benefit from a newer atypical antipsychotic injection regimen. R.R. testified that she would take medication but she objected to injections for fear of side effects.

[5] On the same day, the trial court issued an order finding R.R. to be gravely disabled and in need of commitment to an appropriate facility for a period expected to exceed ninety days. R.R. was committed to IU Health, with the additional grant of authority to IU Health "to treat with the following medication, unless Respondent does not specifically benefit from these medications: Invega sustenna." (App. at 21.) R.R. appeals.

# Discussion and Decision

[6] In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. *T.K. v. Dept. of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015). A "regular commitment" is for an indefinite period of time that may exceed ninety days. *Id.* (citing Ind. Code § 12-26-7 *et seq.*). To obtain an involuntary regular commitment of an individual, a petitioner must prove by clear and convincing evidence that: (1) the individual is mentally ill and either

dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate. I.C. § 12-26-2-5(e).

[7] "[T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake." *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000). The liberty interest at stake in such a proceeding goes beyond a loss of physical freedom; given the stigma and adverse social consequences of confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *T.K.*, 27 N.E.3d at 273. To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *Id.* "Because everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 97 (Ind. Ct. App. 2005), *trans. denied.*

[8] When we review the sufficiency of the evidence supporting a determination made under the statutory requirement of clear and convincing evidence, we will consider only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility. *T.K.*, 27 NE3d at 273. We will affirm if a reasonable trier of fact could find the necessary elements proven by clear and convincing evidence. *Id.*

[9] R.R. does not challenge the finding that she is mentally ill, pursuant to Indiana Code Section 12-7-2-130, which defines mental illness as a psychiatric disorder

that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. She argues that the trial court could not have found by clear and convincing evidence that she is gravely disabled. "Gravely disabled" is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
>
> (2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96.

[10] R.R. asserts that she is able to provide for her essential needs and to function independently; she likens her circumstances to those of the appellant in *T.K.*. There, our Indiana Supreme Court reversed a commitment order, finding that grave disability had not been shown by clear and convincing evidence, when the respondent rented his own home, lived by himself, held full-time employment, owned two vehicles, made no physical outbursts, destroyed no property, did not put himself or others in actual danger with idiosyncratic behavior, and was not at risk of suffering a lack of food, shelter, or clothing. *T.K.*, 27 N.E.3d at 277.

[11] Here, however, IU Health did not merely present evidence of idiosyncratic behavior. Dr. Mayer testified that R.R. has "paranoid delusions involving other people attacking her and doing things to her and threatening her and her loved ones." (Tr. at 5.) According to Dr. Mayer's testimony based upon a

review of R.R.'s mental health treatment, she has both a long history of hospitalizations and a history of non-compliance with her medication regime. As of the hearing date, R.R. continued to suffer from "internalized auditory hallucinations" although they had diminished with medication administered at the hospital. (Tr. at 13.)

[12] R.R. had a residence where she lived with her son, but she felt afraid there and repeatedly summoned assistance. Her unsubstantiated concerns – such as fear that people were urinating down her chimney – caused her to make repeated emergency calls. One responder, who was both an EMT and a police officer, noted that R.R.'s house was covered with trash and feces such that condemnation of the property was expectable. Unlike the appellant in *T.K.,* R.R. was at risk of losing her shelter.

[13] The evidence favorable to the commitment order establishes that R.R. suffers from a substantial impairment of her judgment resulting in an inability to function independently and that she is in danger of coming to harm because she is unable to provide for her essential needs. Accordingly, the "trial judge could have found by clear and convincing evidence" that R.R. was gravely disabled. *T.K.*, 27 N.E.3d at 274.

[14] R.R. also challenges the medication order. A patient possesses a liberty interest in freedom from unwarranted intrusions into his or her physical person and mind while he or she is within an institution. *In re Mental Commitment of M.P.*,

510 N.E.2d 645, 646 (Ind. 1987). Accordingly, our supreme court has held that a petitioner

must demonstrate by clear and convincing evidence that: (1) a current and individual medical assessment of the patient's condition has been made; (2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; (3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient. At the hearing, the testimony of the psychiatrist responsible for the treatment of the individual requesting review must be presented and the patient may present contrary expertise.

Equally basic to court sanctionable forced medications are the following three limiting elements. First, the court must determine that there has been an evaluation of each and every other form of treatment and that each and every alternative form of treatment has been specifically rejected. It must be plain that there exists no less restrictive alternative treatment and that the treatment selected is reasonable and is the one which restricts the patient's liberty the least degree possible. Inherent in this standard is the possibility that, due to the patient's objection, there may be no reasonable treatment available. This possibility is acceptable. The duty to provide treatment does not extend beyond reasonable methods. Second, the court must look to the cause of the commitment. Some handicapped persons cannot have their capacities increased by anti-psychotic medication. The drug therapy must be within the reasonable contemplation of the committing decree. And thirdly, the indefinite administration of these medications is not permissible. Many of these drugs have little or no curative value and their dangerousness increases with the period of ingestion. The court must curtail the time period within which they may be administered. If a patient does not substantially benefit from the medication, it should no longer be administered.

If after the hearing brought about by the objecting patient has taken place, the court is convinced that the State has met its burden of proof of showing, by clear and convincing evidence, a professional judgment having the above recited qualities and characteristics, it should

sanction the forced medication. If it is not so convinced, it should reject such treatment.

*Id.* at 647-48.

[15] Dr. Mayer explained that Invega Sustenna "addresses the underlying neuro biochemical imbalance that's in the brain and therefore directly improves the patient's functioning and reduces their symptoms." (Tr. at 7-8). R.R. contends that she expressed willingness to take that medication orally. She argues that there was no testimony that each and every form of treatment other than injectable Invega Sustenna had been considered and rejected or that the injections represent the least restrictive treatment. Our review of the record reveals otherwise.

[16] When asked about other forms of treatment, Dr. Mayer initially focused on the setting for treatment, as opposed to medication. He was concerned that R.R., as an out-of-county patient, would not qualify for a transitional care facility that would otherwise be preferable to inpatient commitment. However, Dr. Mayer was then specifically asked:

> and so, has every other form, it seems like you've exhausted many, many forms of treatment and so have you looked at every form of treatment that would be possible for [R.R.] and ruled them out and decided that this recommended treatment then is the, is necessary?

(Tr. at 19.) Dr. Mayer responded, "Yes." (Tr. at 19.) Ideally, more elaboration upon Dr. Mayer's evaluative processes might have been elicited at that juncture.

[17] Nonetheless, during the hearing, Dr. Mayer testified that R.R. "becomes very psychotic" when off her medication, oral medication had been prescribed for years, and R.R. had a history of non-compliance. (Tr. at 6.) R.R. testified that she took her medication regularly, specifically, heart medication, cholesterol medication, and Ambient (something she described as "kind of like my Risperdone was"). (Tr. at 22.) However, Dr. Mayer testified that R.R.'s liver enzyme evaluation had revealed some abnormalities, raising "a concern that she may have been taking the wrong medications and too much of them and not enough of the right ones." (Tr. at 29.)

[18] Dr. Mayer considered Invega Sustenna as "a very benign medication in that class" and specified that the benefits "far outweigh any of the risks." (Tr. at 8.) Dr. Mayer opined that the risk of side effects was low and R.R. did not appear to be experiencing significant side effects from the oral form of medication given during her hospitalization. According to Dr. Mayer, injections would require limited occasions of intervention, as it required two injections, four days apart, and then would become only monthly. The hope was that R.R.'s estimated 60% improvement in auditory hallucinations with oral medication could be further improved to the "elimination of psychotic symptoms." (Tr. at 13.) The trial court did not order a particular medication in the absence of testimony of other alternatives; we find R.R.'s argument to be a request to reweigh the evidence presented in this regard.

[19] R.R. also claims that there was no time limitation placed upon the administration of the medication. Again, we disagree with this contention.

Indiana Code Section 12-26-15-1(a) requires the annual review of commitment orders. In compliance therewith, the trial court ordered IU Health to submit a periodic report not later than December 19, 2015. By statute, the forced medication order is not indefinite. The time period of medication administration was curtailed and the order was subject to the limitation of discontinuance if R.R. did not specifically benefit from the medication. Sufficient evidence exists for the medication order.

# Conclusion

[20] IU Health presented sufficient evidence such that the trial court could find by clear and convincing evidence that R.R. was gravely disabled. IU Health established the requisite proof to support the medication order.

[21] Affirmed.

Baker, J., and Mathias, J., concur.