FILED

Aug 04 2023, 9:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Valerie K. Boots
Darren Bedwell
Marion County Public Defender
Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Chadwick C. Duran
Special Assistant United States
Attorney
Department of Veterans Affairs
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of

G.H.,

*Appellant,*

v.

Richard L. Roudebush Veterans
Affairs Medical Center,

*Appellee.*

August 4, 2023

Court of Appeals Case No.
23A-MH-490

Appeal from the Marion County
Superior Court

The Honorable David J. Certo,
Judge

Trial Court Cause No.
49D08-2302-MH-5374

**Opinion by Judge Bailey**
Judges Kenworthy concurs.
Judge Tavitas concurs in part and dissents in part with opinion.

**Bailey, Judge.**

# Case Summary

[1] G.H. appeals an involuntary commitment order which expired on May 13, 2023, and Richard L. Roudebush Veterans Affairs Medical Center ("the Hospital") contends the appeal should be dismissed as moot. However, because we find the case presents an opportunity to develop case law on an issue that is likely to recur in this and other cases—i.e., the proof necessary to impose special conditions on a commitment—we choose to address it on the merits.

[2] We affirm in part, reverse in part, and remand with instructions.

# Issues

[3] We address the following three issues:

    I.     Whether this appeal should be dismissed as moot.

    II.    Whether there was sufficient evidence to support the trial court's finding that G.H. was gravely disabled.

    III.    Whether there was sufficient evidence to support the trial court's imposition of a special condition that G.H. refrain from the use of alcohol and non-prescribed drugs during his commitment.

# Facts and Procedural History

[4]     G.H. is a sixty-two-year-old Air Force veteran.  On February 6, 2023, Dr. Hugo M. Espinosa at the Veterans' Affairs ("VA") NIHCS Acute Mental Health Unit in Marion, Indiana applied for the emergency detention of G.H.  In the application, Dr. Espinosa stated that G.H. had not been taking his psychotropic medications and observed that G.H. reported, "I'm delusional. I feel like monkey pox…I'm having psychosis…delusional thoughts…irrational behaviors…I don't sleep."  App. v. II at 18.  G.H. also reported suicidal and homicidal ideation.  *Id*.  G.H. was admitted to the Hospital in Indianapolis on the afternoon of February 6, 2023.

[5]     Two days later, the Hospital filed a Report Following Emergency Detention and requested a temporary, involuntary commitment.  The Physician's Statement, prepared by Dr. Andrew Filipowicz, identified G.H.'s mental health diagnosis as schizoaffective disorder and stated that G.H. was suffering from "a substantial impairment or obvious deterioration in judgment or reasoning, or behavior that resulted in his inability to function independently."  *Id*. at 23.  Dr. Filipowicz also noted that G.H. was refusing insulin and antipsychotic medications, refusing housing, and not eating, the latter of which had resulted in weight loss. *Id*.

[6]     The trial court held a final evidentiary hearing on February 13, 2023.  At the hearing, Dr. Filipowicz testified that, "[o]n some days," G.H. acknowledged a history of mental health diagnoses, including a history of visual and auditory hallucinations.  *Id*. at 14.  G.H. had taken antipsychotic medications in the past but discontinued taking the medication in 2018.  He was initially admitted to

the Marion VA hospital accompanied by his apartment manager, who expressed concern that G.H. was having visual hallucinations and was making repeated calls to the police regarding property that was allegedly missing from his apartment. G.H. was also expressing suicidal ideations.

[7] Dr. Filipowicz first examined G.H. on February 8, 2023, and diagnosed G.H. with schizoaffective disorder, bi-polar type. Consistent with that diagnosis, G.H. exhibited symptoms that included delusional beliefs that residents were entering his room at night, impulsivity, and irritability. G.H. was also observed speaking in long strings of numbers, and he refused to provide context for those numbers. G.H. was exhibiting disorganized speech patterns, including punning speech. The following day, February 9th, a "Code Orange" was called to summon a disruptive behavior team when G.H. became upset and was slamming things down. Tr. Vol II, p. 12. When the disruptive behavior team appeared, G.H. stated that he did not believe the team could subdue him, and he refused to cooperate. He was then placed in seclusion and threw a chessboard against the wall, began punching the walls, and "tried to charge the door, at which point staff had to help subdue him." *Id*. Staff administered antipsychotic medication to G.H. in order to calm his "aggression." *Id*.

[8] As a result of G.H.'s mental health diagnosis, Dr. Filipowicz prescribed him a twice daily dose of oral Risperidone, which G.H. initially refused but then began to take voluntarily. G.H. began to show improvement after he began taking the medication. Although he was voluntarily taking medications while he was an inpatient, Dr. Filipowicz testified that he believed G.H. had only

limited insight into his mental illness. Indeed, G.H. testified that he did not have schizoaffective disorder, only symptoms he characterized as "depression." *Id*. at 41. G.H. had taken Invega Sustenna "for forty years" but had not taken it since 2018. *Id*. at 38-39. G.H. was willing to continue taking the Risperidone that had been prescribed for him but did not wish to take Invega Sustenna, which he called a "test drug." *Id*. at 39. G.H. testified that, upon release from commitment, he had an affordable VA apartment in which to live, which he described as a "wet facility."[1] *Id*. at 37.

[9] At the time of the hearing, the Hospital had placed G.H. on "escape and assault precautions." *Id*. at 17. Dr. Filipowicz testified that he was concerned that G.H. was gravely disabled. He noted that, if G.H.'s irritable and aggressive behaviors were to manifest, G.H. could cause harm to others or himself. Based on G.H.'s behavior while in inpatient treatment, Dr. Filipowicz was also concerned that G.H. would not be able to function independently in daily activities such as shopping, preparing food, and managing his finances without proper ongoing therapies. Dr. Filipowicz also had concerns about G.H.'s ability to follow up on his medical issues, and Dr. Filipowicz believed that it would be unlikely that G.H. would continue to take his psychiatric medication without a temporary commitment.

---

[1] Neither the parties nor the trial court defined the term "wet facility;" however, we infer from the context of its use in this case and its common meaning that the term means a facility that does not restrict residents' ability to consume alcohol.

[10]     Dr. Filipowicz stated that early and consistent use of medication was the best way to prevent the worsening of G.H.'s symptoms and to preserve independent functioning. The preferred course of treatment for G.H. was to transition him from the oral Risperidone, which he had tolerated well, to Invega Sustenna, a long-acting injectable antipsychotic. Once that transition was completed, Dr. Filipowicz anticipated that G.H. could be discharged to an outpatient setting within four to five days. Regarding a potential commitment order prohibiting G.H. from use of alcohol and drugs, Dr. Filipowicz testified that he didn't "know that substance use has been a [precipitating] factor" or an issue in G.H.'s life. Tr. at 23. However, Dr. Filipowicz stated, "[C]ertainly, I would encourage anyone who is on a medication like Invega, or frankly, any human being, to avoid taking illicit drugs or, you know, overindulging in alcohol." *Id.*

[11]     Following the hearing, the trial court entered an order for the temporary commitment of G.H. until May 13, 2023. In so ordering, the court noted in part that "[t]he record … reflects by [G.H.]'s own testimony, that his thought remains disorganized, that he continues to play word games in alliteration as Dr. Filipowicz indicated he had previously, which is symptomatic of the diagnosis of schizoaffective disorder, [and] that our Respondent, [G.H.], denies he suffers from schizoaffective disorder." *Id.* at 46. The court found that G.H. suffered from mental illness and was gravely disabled. The court further found that G.H. "is unlikely to continue to take medication without commitment and needs case management to function on his own." Appealed Order at 1. As a special condition of the temporary commitment, the court ordered that, "[i]f

G.H. is discharged to a 'wet shelter,' he shall not consume alcohol or drugs except as prescribed." *Id*. at 2. This appeal ensued.

# Discussion and Decision

## Standard of Review

A civil commitment is warranted when the petitioner proves, by clear and convincing evidence, that the 1) individual is mentally ill and either dangerous or gravely disabled; and 2) detention or commitment of that individual is appropriate. Ind. Code § 12-26-2-5; *T.K. v. Department of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015). An appellate court should affirm a civil commitment if based on the "probative evidence and reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find the necessary elements proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273.

## Mootness

G.H. appeals a temporary commitment that expired on May 13, 2023; thus, the Hospital asserts that his appeal should be dismissed as moot. "A case is moot when the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief." *E.F. v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 188 N.E.3d 464, 466 (Ind. 2022). However, under Indiana common law, the appellate courts have discretion to decide moot cases that present issues of great public importance that are likely to recur. *Id*. In the

context of temporary mental health commitments, this Court "routinely consider[s] the merits" of moot cases where the appeal addresses a novel issue, presents a "close case," or presents an opportunity to develop case law on a complicated topic. *Id*. at 467. We do so because a "[c]ivil commitment for any purpose has a very significant impact on the individual and constitutes a significant deprivation of liberty that requires due process protection." *Id*. (quotations and citation omitted). However, "because one of the hallmarks of a moot case is the court's inability to provide effective relief, appellate courts are not required to issue an opinion in every moot case." *Id*. (citations omitted). Rather, we apply the mootness exception "on a case-by-case basis." *Id*. at 465.

Despite the expiration of the temporary commitment, we chose to address the merits of this case because it presents an opportunity to develop case law on a topic that is relatively undeveloped but likely to recur in this case and others: the proof necessary to impose special conditions upon attaining outpatient status.

## Sufficiency of Evidence of Grave Disability

G.H. does not dispute that he has a mental illness; however, he maintains there was insufficient evidence that he was gravely disabled at the time of the hearing. Grave disability in the context of a commitment is:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

(1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12-7-2-96.

[16] The record discloses that, only a week prior to the hearing, G.H. was delusional, hallucinating, and expressing suicidal and homicidal ideations. At that time, G.H. was not taking his psychotropic medication. Only two days before the hearing, G.H. became so disruptive in inpatient treatment that he had to be secluded and sedated. And the trial court noted that G.H.'s testimony at the hearing indicated G.H. still had disorganized thinking and showed other symptoms of an obvious deterioration of judgment, such as a refusal to acknowledge his mental health diagnosis or the necessity of transitioning from Risperidone to the medication Invega Sustenna. That evidence, in addition to the testimony of Dr. Filipowicz that G.H. was gravely disabled—i.e., that his schizoaffective disorder so impaired his ability to function independently and so deteriorated his judgment that he could come to harm without continued treatment in a temporary involuntary commitment— provided ample, clear, and convincing evidence supporting the commitment. G.H.'s contentions to the contrary are requests that we reweigh the evidence and judge witness credibility, which we may not do. *See T.K.*, 27 N.E.3d at 273

## Special Condition of Commitment

[17] G.H. asserts that the trial court abused its discretion when it imposed upon him the special condition that he "shall not consume alcohol or drugs except as prescribed" if he is discharged on outpatient therapy to a "wet shelter." Appealed Order at 2. Indiana law allows a court to impose special conditions when ordering an individual to enter outpatient therapy. Ind. Code § 12-26-14-3. However, there must be sufficient evidence in the record for the trial court to conclude that such a "special condition" bears a reasonable relationship to the treatment of the individual and the protection of the individual and the public. *M.L. v. Eskenazi Health/Midtown Mental Health CMHC*, 80 N.E.3d 219, 223 (Ind. Ct. App. 2017) (citing *Golub v. Giles*, 814 N.E.2d 1034, 1041 (Ind. Ct. App. 2004), *trans. denied*). Thus, we have struck down a special condition prohibiting the use of alcohol and drugs where a doctor requested that condition without any evidence that the individual had ever used or abused such substances. *Id.* at 224; *see also M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 99 (Ind. Ct. App. 2005), *trans. denied*.

[18] In this case, there was no evidence that G.H. had ever abused alcohol or drugs in the past or that he was likely to do so in the future. Rather, Dr. Filipowicz stated that he did not know that "substance use" was ever an issue in G.H.'s life. Tr. at 23. The doctor did opine that he "would encourage anyone" who is on medications such as those prescribed for G.H. to "avoid taking *illicit* drugs or, you know, *over*indulging in alcohol." *Id.* (emphasis added). However, the doctor never stated that G.H. should refrain from *all* alcohol and drug use, such

as use of over-the-counter drugs. Because there was insufficient evidence in the record showing a reasonable relationship between the prohibition on the use of alcohol and drugs and G.H.'s treatment and safety or that of the general public, the special condition should not have been imposed. The trial court abused its discretion in doing so.

## Conclusion

[19] We address the merits of G.H.'s temporary commitment, despite its expiration, in order to develop the case law on the issue of the proof necessary to impose a special condition on an involuntary commitment to outpatient therapy. While we find clear and convincing evidence supporting the involuntary commitment, we find insufficient evidence to support the special condition imposed on G.H.'s outpatient treatment. We affirm the involuntary commitment order in part but reverse in part and remand with instructions to strike the special condition prohibiting G.H. from consuming alcohol and drugs during his outpatient treatment.

[20] Affirmed in part, reversed in part, and remanded with instructions.

Judge Kenworthy concurs.

Judge Tavitas concur in part and dissents in part with opinion.

**Judge Tavitas, concurring in part and dissenting in part.**

[21]     I concur that the evidence was sufficient to find G.H. gravely disabled. I dissent, however, from the majority's determination that the evidence was insufficient to support the imposition of a special condition. G.H. anticipated returning to an apartment at a "wet facility" for veterans upon his release from inpatient care. Tr. Vol. II p. 37. When discussing the order to avoid using alcohol and non-prescribed drugs, Dr. Flipowicz testified that avoiding "illicit drugs" and "overindulging in alcohol" is encouraged when taking "a medication like Invega." Id. at 23. Given the need to avoid non-prescribed drugs and alcohol during treatment with Invega and the implicit reduction in supervision after G.H.'s release from inpatient care, I conclude that the trial court did not abuse its discretion by imposing the special condition of avoiding the consumption of non-prescribed drugs or alcohol.