

I N T H E

# Court of Appeals of Indiana



FILED

May 07 2025, 11:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

In the Matter of the Civil Commitment of:
A.S.,

*Appellant-Respondent*

v.

Community Fairbanks Behavioral Health,

*Appellee-Petitioner*

---

May 7, 2025

Court of Appeals Case No.
25A-MH-804

Appeal from the Marion Superior Court

The Honorable Denise F. Hayden, Judge Pro Tempore

Trial Court Cause No.
49D08-2503-MH-12770

---

**Opinion by Judge Weissmann**
Judges Brown and Foley concur.

**Weissmann, Judge.**

[1]     Believing his family had lobotomized him in his sleep and that they were watching him on cameras within his home, 33-year-old A.S. boarded up, barred, or zip tied every window and door into his residence. He then staged a suicide scene, with a noose hanging from the ceiling over a chair and suicide notes to friends and family strewn about, in a purported attempt to catch the surveillants. Following this incident and A.S.'s emergency hospitalization, the trial court found that A.S. is mentally ill and dangerous to himself and others. The court therefore ordered A.S.'s temporary commitment at Community Fairbanks Behavioral Health (Hospital).

[2]     A.S. appeals, not disputing his mental illness but claiming the trial court erred in finding he was dangerous to himself or others. A.S. also challenges the trial court's order that, as a special condition of his commitment, he refrain from "harass[ing] or assault[ing] family members or others." App. Vol. II, p. 31. We find the record contains sufficient evidence of A.S.'s dangerousness. However, we conclude that the special condition, which was not specifically imposed as a condition of outpatient treatment, is moot and improperly imposed on his in-patient commitment. Therefore, we reverse the special condition as it applies to A.S.'s in-patient commitment and otherwise affirm the judgment.

## Facts

[3]     Beginning in October 2023, A.S. came to believe that his father and brother were "starting to do some things to him and drug him and sedate him." Tr. Vol.

II, p. 8. A.S.'s erratic reports of these suspicions to his best friend, who lived in Colorado, continued over the next few months.

[4] In January 2024, A.S. blocked his brother (Brother) from further contact by phone, though the two had previously communicated regularly. A.S. also sent a text message to his friend, stating, "if I die, my family killed me." *Id.* at 9. A.S. claimed his father had given him some substance that changed his brain chemistry and later asserted his father had sedated and lobotomized him. Upon hearing these reports, A.S.'s friend suggested A.S. seek treatment for what the friend suspected was psychosis. A.S. was resistant, claiming that treatment would not assist him and might exacerbate his problems.

[5] At the end of February 2024, A.S. told his friend that he had "ratcheted the doors shut so nobody could get into his house." *Id.* at 12. A.S. suspected his family was trying to break into the home so that they could drug him, make him appear to suffer from severe mental illness, and ensure he took medication to treat that condition. In that vein, A.S. told his friend that he believed his family was "essentially bombing the house that he lived in and drugging him and coming in and messing with him while he was sedated." *Id.* at 20.

[6] On March 3, 2024, A.S. unblocked his brother from communications. A.S. accused Brother of having cameras in A.S.'s home, which was a rental owned by Brother. A.S. also asked Brother why he would do this—that is, install cameras, drug him, and perform a lobotomy. Brother denied ever engaging in such activities.

[7] Two weeks later, A.S. texted his friend and said, "if I die, it was [Brother], you can have all my stuff." *Id.* at 13. On the same day, A.S. texted Brother and led him to believe that A.S. was contemplating suicide. This communication resulted in Brother requesting that police conduct a welfare check on A.S. Although the record provides few details of the police check, it ended with A.S. being handcuffed in an ambulance and transported to Hospital.

[8] Afterward, Brother met police at A.S.'s home. They found within the home a noose hanging from the ceiling with a wheelchair underneath it, as well as letters to family members purporting to distribute A.S.'s belongings. The letters noted that A.S. "was sorry for doing this and the reason why he was doing it." *Id.* at 35. Brother interpreted the letters as indicating A.S.'s intent to commit suicide because "[h]e was afraid he was going to end up hurting somebody or harm[ing] his family because [of] the thoughts that were going through his head." *Id.*

[9] All the doors in the home were boarded up, with ratchet straps attached and handles removed. Each window of the home was secured shut with zip ties. The carpet and bedroom floor were "ripped up" in what A.S.'s brother suspected was A.S.'s effort to find the non-existent trap door through which A.S. believed his family surreptitiously entered the home. *Id.* at 34-35. A.S. also had blocked all the HVAC returns, including a return air vent over which A.S. had installed two bars into the wall.

[10] Three days later Hospital petitioned for A.S.'s emergency detention. Hospital alleged that A.S. was mentally ill with an unspecified psychiatric disorder and that he was both dangerous to himself and gravely disabled. In its order granting that petition, the trial court specified that, if Hospital "believes a temporary or regular commitment is necessary, [Hospital] is ORDERED to file a request for hearing seven days from admission, excluding weekends and holidays." App. Vol. II, p. 11.

[11] Hospital timely petitioned for a hearing, at which it sought a temporary commitment of A.S. Hospital alleged in the petition that A.S. had a psychiatric disorder (schizophrenia), had declined treatment for it, and was a danger to himself. This petition did not allege A.S. was gravely disabled.

[12] During his hospitalization leading up to the commitment hearing, A.S. would not take prescribed medication, and his condition did not improve. He told his treating psychiatrist, Dr. Jason Ehret, that his family drugged and tried to smother him "but not quite kill him." Tr. Vol. II, p. 43. A.S. also reported that his father was placing his fingers in A.S.'s rectum and that family members lobotomized him. A.S. remained convinced that a camera system was installed in his house to monitor him. Still, A.S. cared for his personal needs during his hospitalization and did not have any adverse interactions with other patients or staff.

[13] At the commitment hearing, Dr. Ehret testified that A.S.'s delusions were significant and "impacting his life severely." *Id.* at 45. Finding that A.S. had a

delusional disorder without any insight and that he was at high risk of suicide, Dr. Ehret concluded that A.S. was dangerous to himself.

[14] While testifying at the hearing, A.S. denied having any delusions or that he suffered from a delusional disorder. Although A.S. acknowledged that he blocked all entries into his home and wrote the suicide notes, he categorized his actions as an ill-thought-out effort to catch the intruders who had invaded his home and body. He remained convinced that he had evidence that these events occurred, including clicking sounds from the alleged cameras and a sore eye that he believed was indicative of a family-performed lobotomy. A.S. also related periods for which he has no memory—a circumstance that he attributed to intruders illicitly drugging him.

[15] The trial court ordered a temporary commitment of A.S. based on what it viewed as clear and convincing evidence that A.S. was mentally ill, was a danger to himself or others, and needed care, custody, and treatment at Hospital for a period not exceeding 90 days. A.S. appeals.

## Discussion and Decision

[16] A.S. contends the evidence did not support either the trial court's finding that he was dangerous to himself and others or its imposition of the special condition prohibiting his assault or harassment of his family or others. In reviewing such sufficiency claims, "we consider only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility." *A.O. v. Cmty. Health Network, Inc.*, 206 N.E.3d

1191, 1193 (Ind. Ct. App. 2023). "We will affirm if clear and convincing evidence supports the trial court's judgment." *Id.* "Clear and convincing evidence is an intermediate standard of proof that is greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *T.D. v. Eskenazi Health Midtown Cnty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015).

[17] An individual may be involuntarily committed in Indiana if the petitioner proves by clear and convincing evidence that (1) "the individual is mentally ill and either dangerous or gravely disabled" and (2) "detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e). Because the statute is written in the disjunctive, the petitioner need only prove that the individual is mentally ill and either dangerous or gravely disabled—not both—to carry the petitioner's burden of proof. *A.P. v. Cmty. Health Network, Inc.*, 238 N.E.3d 704, 709 (Ind. Ct. App. 2024).

[18] Here, the trial court found that A.S. was mentally ill, having been diagnosed with schizophrenia. Although it did not find that A.S. was gravely disabled, the court determined that A.S. was dangerous to himself or others and in need of custody, care, and treatment not to exceed 90 days. As a special condition of A.S.'s commitment, the court required that A.S. refrain from "harass[ing] or assault[ing] family members or others." App. Vol. II, p. 31. We address separately A.S.'s challenges to the "dangerous" finding and to this special condition.

## A. Clear and Convincing Evidence Supports the Court's Determination that A.S. Was "Dangerous" to Himself

[19] In the civil commitment context, "'dangerous' . . . means a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." Ind. Code § 12-7-2-53(a). "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness." *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 97 (Ind. Ct. App. 2005).

[20] A.S. claims the evidence supporting the trial court's finding that he was dangerous to himself or others is speculative and therefore lacks the certainty that is required in commitment proceedings. *See generally Civil Commitment of T.K. v. Dept. of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (noting that due process requires proof by clear and convincing evidence in commitment proceedings); *F.L. v. Cmty. Fairbanks Behavioral Health*, 245 N.E.3d 1033, 1035 (Ind. Ct. App. 2024) ("Clear and convincing evidence requires proof that the existence of a fact is "highly probable."). Finding A.S.'s argument is largely an invitation to reweigh the evidence, we conclude that Hospital proved by clear and convincing evidence that A.S. was dangerous to himself. *See* Ind. Code § 12-7-2-53(a).

[21] A.S. asserts that there was no evidence that he was dangerous to himself at the time of the commitment hearing. He focuses on evidence that, during his hospitalization, he did not repeat the suicidal ideations documented before his

admission. But the record, as a whole, shows that at the time of the commitment hearing, A.S. was dangerous to himself.

[22] Dr. Ehret directly testified at the commitment hearing that A.S. was a danger to himself. Diagnosing A.S. with a "delusional disorder . . . with no insight," Dr. Ehret opined that A.S.'s "risk of suicide is high." Tr. Vol. II, p. 47. A.S.'s delusions were significant and "impacting his life severely," according to Dr. Ehret. *Id.* at 45. Even at the commitment hearing, A.S. remained steadfast in his view that intruders were monitoring him by camera within his home and had harmed him there while he was sleeping or unconscious.

[23] A.S.'s condition had not improved during his hospitalization, as he had refused to take prescription medication that Dr. Ehret deemed necessary to treat A.S.'s mental illness. A.S. also expressed hesitancy in taking prescribed medication if he were released, rather than committed. He testified that he would do so only "[i]f it was prescribed after months and months of therapy and showing a therapist what I have as evidence and then still saying that there's a problem." *Id.* at 79.

[24] And although A.S. testified that the suicide scene was staged as a ruse to flush out the intruders that he believed were monitoring his movements and invading his home and body, the circumstances suggest a different intent. The suicide notes were numerous and lengthy and purported to distribute A.S.'s personal belongings among various relatives. The gist of the notes was that A.S. was committing suicide because he feared he would end up hurting somebody or

harming his family based on "the thoughts that were going through his head." *Id.* at 35. A.S.'s preparation of the suicide scene was so extensive that Dr. Ehret thought it probably took days to complete.

Where evidence is capable of multiple interpretations, "we are bound to view only that evidence that is most favorable to the trial court's judgment." *Golub v. Giles*, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004). Clear and convincing evidence, including A.S.'s suicide preparations, shows that A.S. is dangerous to himself. *See C.J. v. Health and Hosp. Corp. of Marion Co.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006) (ruling that a trial court need not wait until harm has occurred before determining that an individual is dangerous to himself or others).

## B.  The Challenged Special Condition is Moot

A court may require "an individual ordered to enter an outpatient therapy program" to "comply with . . . conditions determined by the court." Ind. Code § 12-26-14-3(4). "Such special conditions 'must be reasonably designed to protect the individual as well as the general public.'" *M.L. v. Eskenazi Health/Midtown Mental Health CMHC*, 80 N.E.3d 219, 223 (Ind. Ct. App. 2017) (quoting *Golub*, 814 N.E.2d at 1041). The record must contain sufficient evidence from which the trial court may conclude that the special condition at issue here "bears a reasonable relationship" to the committed individual's treatment and to the protection of others. *Golub*, 814 N.E.2d at 1041.

A.S. contends the special condition that he refrain from "harass[ing] or assault[ing] family members or others" is unsupported by the evidence. App. Vol. II, p. 31. We agree that the special condition is deficient but for a different reason.

The trial court's order involuntarily committing A.S. to Hospital for a period not exceeding 90 days does not limit the challenged special condition to an *involuntary* outpatient commitment. In fact, the commitment order does not mention outpatient treatment at all. Instead, the order in this case simply committed A.S. to Hospital "until June 26, 2025, unless discharged prior." *Id.*

"While a trial court may order an individual entering an *out-patient* therapy program to 'comply with other conditions determined by the court,' I.C. § 12-26-14-3(4), there is no provision enabling a trial court to impose special conditions upon an individual being involuntarily committed as an *in-patient*." *Golub*, 814 N.E.2d at 1040 (emphasis added); *see* Ind. Code § 12-26-6 et seq. (involuntary temporary commitment statutes, which are silent as to special conditions). As this Court noted in *Golub*:

> When an individual enters a mental health facility as an in-patient, he must follow the facility's rules, policies, and procedures. Thus, it is up to the facility, not the trial court, to impose conditions on the patient such as attending therapy sessions, taking prescribed medications, and abstaining from drug and alcohol use. If and when the trial court orders the individual to take part in out-patient therapy, then it may be appropriate for the court to place special conditions on the individual. *See* I.C. § 12–26–14–3(4).

814 N.E.2d at 1040.

[30] A.S. was required to follow the rules, policies, and procedures of Hospital while he was receiving inpatient treatment there during his involuntary commitment. *See id.* Accordingly, the challenged special condition imposing additional rules on his inpatient commitment is "moot and improperly imposed." *Id.* at 1041; *see also Commitment of M.M.,* 826 N.E.2d at 99 (striking special conditions as they applied to involuntary inpatient commitment imposed by order that did not limit those special conditions to outpatient therapy).

[31] We reverse the trial court's imposition of the special condition on A.S.'s temporary commitment requiring that A.S. refrain from harassing or assaulting family members or others. We otherwise affirm the trial court's temporary commitment order.

[32] Affirmed in part and reversed in part.

Brown, J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

Casey Farrington
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Jenny R. Buchheit
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana